EMMETT MORAN *et al.*, Plaintiffs-Appellants, *v.* THE COMMONWEALTH EDISON COMPANY *et al.*, Defendants-Appellees.—(JEAN K. NESSINGER *et al.*, Appellees.)

Third District   No. 78-433

Opinion filed August 16, 1979.

Jerome Mirza and Associates, Ltd., of Bloomington, for appellants.

Robert M. Hansen and George Herbolsheimer, both of Herbolsheimer, Lannor, Henson and Duncan, P. C., of La Salle, for appellee Commonwealth Edison Co.

Berry and O'Conor, of Ottawa, for appellees Velma Kennedy, Max Ugolini, Coleen Ugolini and Roland Sebby.

Dunn & Fichter, P. C., of Decatur, and Robert E. White, of Ottawa, for appellees Jean K. Nessinger, Francis Nessinger, Hugh R. Killelea and Agnes H. Killelea.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal by the plaintiffs Moran, Logsdon and Hallett from orders of the circuit court of La Salle County which dismissed their suit in forcible entry and detainer against the defendants Commonwealth Edison Company, the Kennedys, Ugolinis, and Sebby. The other order from which this appeal is taken was the dismissal of a petition filed by the plaintiffs against the Nessingers and Killeleas which sought all or a portion

of a sum of money which was to be received by the latter individuals from Commonwealth in settlement of a contract action.

The factual situation which ultimately gave rise to this appeal is complex, and in order to properly set forth the same we must hark back to the spring of the year 1971. At that time Commonwealth Edison was desirous of constructing an atomic power plant and lake. Prior to April 10, 1971, Hugh R. Killelea, Stacia Hynds and Jean K. Nessinger and their respective spouses were the owners of approximately 320 acres of farmland in La Salle County which was to become the subject of this lawsuit. Commonwealth was desirous of obtaining this land and in fact did so by two separate contracts. The first contract was entered into by Stacia and Douglas A. Hynds and Hugh R. Killelea and Agnes Killelea as sellers and Commonwealth Edison as the buyer. This contract was executed on April 10, 1971, and contained the following pertinent provisions:

"For the farming year of 1971 the Sellers agree to rent the land from the Purchaser on the basis of $10.00 per acre per year in exchange for which the Sellers herein will receive the landlord's share of the crop and pay the landlord's share of the expenses, except taxes.

In the event the land in question, or any part thereof, continues to be used for agricultural purposes, the Seller herein will have the option to lease the same from the Purchaser on the basis of $22.50 per acre per year."

On May 12, 1971, the Nessingers entered into a contract for exchange of deeds which resulted in the conveyance of the remainder of the land to Commonwealth.

The May 12, 1971, agreement contained the following provisions:

"For the farming year of 1971 Jean K. Nessinger and Francis Nessinger, together with the other previous owners, shall have the privilege to rent the land in Tract No. 1 on the basis of $10.00 per acre per year, in exchange for which the Parties of the First Part will receive their share of the landlord's share of the crop and pay their share of the landlord's share of the expenses, except taxes.

In the event the land in Tract No. 1, or any part thereof, continues to be used for agricultural purposes, Jean K. Nessinger and Francis Nessinger, together with Stacia Hynds and Hugh Killelea, will have the option to lease the same from the Party of the Second Part on the basis of $22.50 per acre per year."

For the farming season of 1971, Hugh R. Killelea and Jean K. Nessinger executed a farm lease for a portion of the land conveyed by them. For the farming season of 1972 the Killeleas and Nessingers leased the entire 320 acres from Commonwealth. By correspondence dated

October 3, 1972, Commonwealth notified the Killeleas and Nessingers that the land would not be available for farming in the year of 1973 and that they were to deliver up possession of the land on the last day of February 1973. On January 28, 1974, the Killeleas and Nessingers gave Commonwealth written notice that they would exercise their option to lease the land in question for farming purposes. They predicated their option on the provisions contained in the May 10, 1971, contract for deed and the May 12, 1971, contract for exchange of deeds. The Killeleas and Nessingers further informed Commonwealth that they were prepared to tender the $22.50 per acre rental payment. On the same date, namely January 28, 1974, the Killeleas and Nessingers sublet the land to the plaintiffs Moran, Logsdon and Hallett. At the time of the subletting the Killeleas and Nessingers were represented by counsel who was later charged by the sublessors with misconduct as far as his representation was concerned. A more detailed account of this facet of this appeal will be set forth if it becomes pertinent to the determination of the issues presented.

In March 1974, the Killeleas, Nessingers, Moran, Logsdon and Hallett as plaintiffs filed a forcible entry and detainer action against Commonwealth. This action in the circuit court of La Salle County was given number 74—3—1203SC.

It is apparent that some efforts were made to settle the forcible entry and detainer case. On May 2, 1974, a document dated May 1, 1974, purporting to be a stipulation settling the forcible entry case between the Killeleas and Nessingers was filed in the office of the Circuit Clerk of La Salle County. On the same date an order was entered by the circuit court dismissing with prejudice the Killeleas and Nessingers as plaintiffs in the forcible entry and detainer suit. The dismissed plaintiffs disavowed the stipulated settlement and by new counsel on May 29, 1974, moved to vacate and set aside the dismissal order.

It was during this sequence of events that Commonwealth conveyed portions of the land in question to Kennedys, Ugolinis, and Sebby, the latter being a tenant. These individuals were added as parties defendant in the forcible entry and detainer action.

On July 22, 1976, the circuit court on its own motion held that in the forcible entry and detainer case, No. 74—3—1203SC, the Killeleas and Nessingers were not necessary and proper parties and they were dismissed, leaving only Moran, Hallett and Logsdon as party plaintiffs in the action.

On January 10, 1977, the Killeleas and Nessingers brought suit for breach of contract against Commonwealth, alleging that the defendant had breached the 1971 contract for deed and contract for exchange of deeds. This action was styled as No. 77—L—12. Shortly thereafter case

No. 74—3—1203SC and case No. 77—L—12 were consolidated for trial.

On or about June 12, 1978, the circuit court was advised by counsel for the Killeleas and Nessingers that the breach of contract suit (case No. 77—L—12) between his clients and Commonwealth had been settled and that settlement documents were being prepared. On August 23, 1978, the plaintiffs Moran, Hallett and Logsdon filed a petition for equitable distribution of the settlement proceeds.

On September 1, 1978, the court entered an order dismissing the forcible entry action, being case No. 74—3—1203SC. On the same day the court entered its order denying the petition for equitable distribution of settlement proceeds in case No. 77—L—12. This appeal ensued from these two orders.

Two issues are presented to the court for determination. The first broadly stated is whether the trial court properly dismissed the forcible entry and detainer action.

■■ At the outset it should be noted that all parties to this appeal are in agreement that the sublessee plaintiffs Moran, Logsdon and Hallett would have only the rights in the premises leased as were vested in and possessed by their lessors, to-wit, the Killeleas and Nessingers, and which were derived from the provisions of the contract for deed and contract for exchange of deeds entered into by them with the Commonwealth Edison Company. The parties recognized that such is the law in our State. (See *Wilson-Broadway Bldg. Corp. v. Northwestern Elevated R.R. Co.* (1922), 225 Ill. App. 306.) The plaintiffs as sublessees are further as a matter of law charged with notice of all conditions in said agreements and are bound thereby. *Wilson-Broadway Bldg. Corp. v. Northwestern Elevated R.R. Co.*

In reaching its decision to dismiss the forcible entry and detainer action the trial court first found that the terms of the contract entered into between the Killeleas and Nessingers with Commonwealth were so vague and ambiguous that it was necessary for the court to determine the intent of the parties.

Both of the contracts entered into with Commonwealth contained a certain provision which we have heretofore set forth, the general tenor of the crucial provision being that as long as the land in question, or any part thereof, was continuously used for agricultural purposes the sellers or vendors (the Killeleas, Nessingers and Hynds) would have the option of leasing the same from the purchaser, Commonwealth, on the basis of $22.50 per acre per year. The threshold question is whether or not the provisions in each of the contracts containing the above language are vague and ambiguous. If ambiguous, the trial court may go outside the written agreement of the parties in order to determine the intent of the parties.

■■ In examining the contracts entered into by the Killeleas and the Nessingers, it is clear that they contemplated the granting of an option to the vendors. The option was for a specific purpose, namely the leasing of land. In examining the language pertaining to the right to exercise an option to lease land, the question immediately posed is how long is the duration of the agreement granting the right to exercise the option, or if the option is exercised, need it only be exercised once and then will the lease remain in effect as long as the land is used for agricultural purposes which might be *ad infinitum,* or must the option be exercised annually? These questions are unanswerable from an examination of only the provisions contained in the contract. It can only be concluded that the provisions pertaining to an "option to lease" are patently ambiguous.

This court is mindful of the law that a lease need not actually name the period during which a tenancy is to endure, but it may fix such period by reference to some collateral fact or event, if reference is such as to enable duration of the term to be ascertained at any time. (See *Stanmeyer v. Davis* (1944), 321 Ill. App. 227, 53 N.E.2d 22.) The plaintiffs urge that the contract provisions relating to the "option to lease" are not ambiguous as to the question of "duration" and cite in support of this contention the case of *Illinois Central R.R. Co. v. Michigan Central R.R. Co.* (1958), 18 Ill. App. 2d 462, 152 N.E.2d 627. A reading of the *Illinois Central* case discloses that the effect of that case on the instant case is far from crystal clear. In the case of *Illinois Central* we find a situation where a written instrument contained a provision where a railroad company could use certain premises as long as the same were used for a general passenger station. The reviewing court in a lengthy opinion concerned itself as to whether the instrument constituted a lease or a contract, and determined that regardless of its nomenclature millions of dollars had been expended in establishing and maintaining the railroad facilities and that the law looked favorably upon agreements consolidating railroad terminals and terminal facilities. It was the decision of the reviewing court in the Illinois Central case that the duration of the possession of the railroad facilities was made certain by the term contained in the written instrument, to-wit, *so long as said premises shall be used for a general passenger station.* It should further be noted that in the case of *Illinois Central* the trial court heard evidence of the circumstances surrounding the execution of the contract of the historical relationship of the railway companies, and of events relevant to the contemporaneous construction of the terms of the contract.

We fail to follow the plaintiffs' reasoning that the case of *Illinois Central* is controlling as to the instant case, since it is cited for the proposition that the contract provisions before this court are not so vague or ambiguous as to require a construction of the provisions by going

outside the written agreement in order to ascertain the parties' intent. In the case of *Illinois Central* the trial court did go outside the written agreement in order to establish the duration of the possession granted for the use of the premises.

The trial court was correct in the instant case in finding the provisions in the contract between the Killeleas and the Nessingers so vague and ambiguous as to make it necessary in determining the intent of the parties to consider extraneous transactions and circumstances.

A cardinal rule as to the interpretation of contracts is as follows:

> "The cardinal principle in the interpretation of contracts, including offers, options, and contracts for the sale of land, is to ascertain the intention of the parties and give effect thereto if it can be collected from the instrument and the circumstances without violating some settled legal principle. The court will look at the contract from the standpoint of the parties at the time they executed it, and the purpose they had in view in doing so. The intent of the parties thus expressed is to be carried into effect as far as consistent with rules of law. Words are to be construed in the manner in which the parties understood them; resort is to be had to every clause and word in the instrument for the purpose of ascertaining that understanding and intent. A land contract is to be viewed as a whole and in the light of the circumstances surrounding its execution, with a view to determining the intention of the parties. Where it consists of or is evidenced by several connected instruments constituting one entire transaction, they must be construed together as a whole, and not as separate independent purchases or transactions." 77 Am. Jur. 2d *Vendors & Purchasers* §60, at 244 (1975).

We glean from the pleadings filed in this case and from oral argument of counsel before this court that Commonwealth Edison Company prior to April 1971 was attempting to purchase almost all of Brookfield Township in La Salle County, Illinois, for the purpose of constructing a nuclear power plant and a large lake which such an operation was believed to necessitate. As the result of extensive litigation the size of the lake was substantially reduced. Portions of the land acquired by Commonwealth which were not needed for the lake after its size had been reduced were sold back to farmers. The land involved in this suit was included in the portion not needed for lake purposes and was sold by Commonwealth to the defendants Kennedys, Ugolinis and Sebby.

It should be noted that in the contract for deed and contract for exchange of deeds executed by the Killeleas and the Nessingers with Commonwealth that in each case the contract expressly provides the option to lease is from the *purchaser* or the *party of the second part*. In

each instance the purchaser or party of the second part is the Commonwealth Edison Company. A tortious construction would have to be applied to such language to reach any conclusion other than that any lease executed was to be from Commonwealth as lessor.

In interpreting the contract provisions it should be borne in mind that Commonwealth was engaged in the utility business rather than in farming operations. Commonwealth was desirous of using the purchased land for a lake site, and until litigation curtailed the size of the proposed lake it would have been contrary to good planning to enter into long-term farm leases as to the premises in question.

On August 12, 1971, Commonwealth did enter into a farm lease with Killelea and Nessinger for the period of June 1, 1971, to February 28, 1972. This lease contained what we deem to be two pertinent paragraphs. The first paragraph provided:

"This lease shall commence on June 1, 1971 and expire on February 28, 1972, and is only renewable by a new Indenture of Lease made between the Lessor and Lessee on or before the date of October 1, 1971."

Paragraph 13 provides:

"Lessee hereby agrees that Lessee shall vacate, cease using, and occupying the farm together with improvements covered in this lease, upon the termination of the term hereof."

The Killeleas and Nessingers, pursuant to the term of a lease executed with Commonwealth, also farmed the premises for the year of 1972. This lease was for the period of March 1, 1972, to February 28, 1973, and contained the following provisions which we deem pertinent to the issue being considered:

"FIRST: This Lease shall commence on March 1, 1972, and expire on February 28, 1973, and is only renewable by a new Indenture of Lease made between the Lessor and Lessee on or before the date of October 1, 1972."

"THIRTEENTH: Lessees hereby agree that upon the termination of this lease, Lessees shall not be entitled to any emblements and shall not have any right to remain in possession of the farm after such termination nor to re-enter for the purpose of harvesting crops which shall not have matured at the date of such termination."

"FOURTEENTH: Lessees hereby agree that Lessees shall vacate, cease using and occupying the farm, together with improvements covered in this Lease, upon the termination of the term hereof."

"SIXTEENTH: This Lease shall not in any manner or to any extent limit or restrict the right of Lessor to use or dispose of the farm as Lessor in its discretion may desire, and particularly, but

not in limitation of the foregoing, Lessor, at all times, shall have free and unrestricted access for its employees, agents, representatives, assigns or grantees to come upon the farm, either by vehicle or on foot, for the purpose of constructing, installing, operating, maintaining, repairing, replacing or patrolling any or all of its facilities and equipment located thereon. Lessor shall not be liable to any extent for any damages to Lessees' property or any crops which may be on the farm that may be occasioned as a result of entry by Lessor's employees, agents, representatives, assigns or grantees or resulting from the construction, installation, operation, maintenance, repairing, replacing or patrolling of any of Lessor's facilities and equipment located or to be located on the farm."

"SEVENTEENTH: Lessees hereby agree not to sublet the farm nor any part thereof, nor assign this lease and will not permit any transfer by operation of law of the interest in the farm acquired through this lease."

"TWENTY-SECOND: This lease may be terminated by Lessor at any time during the term hereof by giving Lessees 180 days' prior written notice of such termination. In the event this lease is terminated pursuant to the provisions of the paragraph, Lessor shall not be liable or responsible to any extent to reimburse Lessees for any costs in connection with farming Lessor's property or for any crop damage which occurs in connection with the termination of this lease. The mailing of such notice in accordance with Paragraph TWENTY-SIXTH hereof shall be demed to be sufficient service thereof."

"TWENTY-THIRD: In the event this lease is terminated by Lessor prior to November 15, 1972, or should Lessor take any portion of the property used for farming under the terms of this lease for its utility facilities prior to November 15, 1972, Lessor hereby agrees to pay Lessees the sum of $30.00 per acre as liquidated damages in full for the termination of the lease or for any portion that Lessor has taken for its use. In the event Lessor terminates this lease prior to November 15, 1972, Lessees shall have no obligation whatsoever to make the rental payment in the amount of $7,200.00 as required in Paragraph SECOND of this lease. However, if Lessor takes only a portion of the farm prior to the date the rent is due, Lessees shall be obligated to pay rent only for that portion that Lessees are using for farming purposes."

The nature of Commonwealth's business, its purpose in purchasing the land in question and various terms of the two leases entered into by Commonwealth and the Killeleas and Nessingers have been set forth in

order to determine the intent of the parties when the contracts for sale of the land were executed. A generally recognized principle in the interpretation of contracts is that if the contract be regarded as ambiguous or uncertain, the practical construction of the contract as shown by the acts of the parties thereto is persuasive of the true construction to be accorded the contract. (See *Northern Illinois Coal Corp. v. Cryder* (1935), 361 Ill. 274, 197 N.E. 750; also Annot., 101 A.L.R. 1420, and Illinois cases cited therein.) Where parties have adopted a particular construction of doubtful terms or conditions of contract, the court will follow such construction. In case of doubt, the interpretation which parties by their acts under the contract have given it will have weight and may be controlling providing plain terms of agreement are not overthrown. (See *Wright v. Loring* (1933), 351 Ill. 584, 184 N.E. 865, and *Nelson v. John B. Colegrove & Co. State Bank* (1933), 354 Ill. 408, 188 N.E. 461.) This court has held that it is not unusual or erroneous to consider several separate writings to determine nature of agreement which is at issue. See *H. B. G. Corp. v. Houbolt* (1977), 51 Ill. App. 3d 955, 367 N.E.2d 432.

■■ It has been previously stated herein that this court agrees with the trial court's finding that the contracts entered into between the Killeleas and Nessingers and Commonwealth were vague and ambiguous. Having so concluded and pursuant to the authority contained in the cited cases this court, as did the trial court, of necessity must concern itself with the circumstances existing at the time of the execution of the contracts and the separate writings of the parties. The surrounding circumstances can be briefly summarized by recognizing the obvious, to-wit, the nature of Commonwealth's business is not agricultural, and the purpose of purchasing the land in question was to construct a lake which was to be used in the operation of a nuclear power plant which was to be built. Examining the separate writings (leases) entered into between Commonwealth and the Killeleas and Nessingers we find provisions pertaining to renewal, right of the lessor Commonwealth to use or dispose of the land, unlimited right of access to land by Commonwealth, right of Commonwealth to terminate the lease, and prohibition of assigning the lease or subletting the farm by the lessees. These provisions are refutative of the plaintiffs' contention that the contracts for deed between the Killeleas and Nessingers and Commonwealth created a tenancy for a term. Commonwealth could lease or refuse to lease the land, and could sell all or a portion of it. The Killeleas and Nessingers were not vested with any possessory rights in the land. Having no such rights, the Killeleas and the Nessingers could not by a sublease establish the same. Conversely stated, the plaintiffs as sublessees would have only those rights in the land

leased by them as were vested in and possessed by their lessors, the Killeleas and the Nessingers. We agree with the trial court; the forcible entry and detainer suit was properly dismissed.

The remaining issue presented in the appeal is whether the trial court properly ruled that the plaintiffs had no standing to file a petition for equitable distribution of settlement proceeds received by the Killeleas and the Nessingers from Commonwealth.

In determining this issue it should be noted that case No. 74—3—1203SC (the forcible entry action) and case No. 77—L—12 (the breach of contract action) had been consolidated pursuant to a motion made by the plaintiffs Killeleas and Nessingers in the breach of contract. Anyone not a party to an action is a stranger and as such before being permitted to intervene, there must be compliance with sections 25 and 26.1 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, pars. 25 and 26.1). Whether intervention is permissive or a matter of right the law required that a timely application to intervene be made. (See *Feiertag v. Reichmann* (1959), 21 Ill. App. 2d 215, 157 N.E.2d 818.) In the situation before this court the plaintiffs permitted one year and seven months to lapse before they made their attempt to intervene in the breach of contract action which had been brought against Commonwealth. Permitting such a lapse of time cannot be construed as acting in a timely manner. Timeliness of application is a matter within the discretion of the court. (See *County of Cook v. Triangle Sign Co.* (1963), 40 Ill. App. 2d 202, 189 N.E.2d 25.) We cannot conclude that the trial court abused its discretion.

We further question whether the pleading filed by the plaintiffs entitled "Petition for Equitable Distribution of Proceeds" meets the requirements necessary to be an application to intervene. The document never asks the court for permission to intervene, but instead requests that the court enter an order directing that sums of money from a settlement of the breach of contract action be paid over to the plaintiffs, the petitioners as they were so designated in their pleadings. The document or pleading further fails to state whether the petitioners should be made parties plaintiff or defendant. The pleading on its face is bereft of any statements of fact that the petitioners have either standing or priority in the breach of contract action, and this failure to establish privity was observed and commented on by the trial court.

The plaintiffs in their brief argue that they were at all times parties to the entire consolidated action and hence there was no need to file a petition to intervene. Such an assertion cannot be sustained for the record discloses otherwise. The plaintiffs were never parties in the breach of contract action wherein they alleged a settlement had been made.

It is evident that the plaintiffs were attempting to do by indirection what they had been precluded from doing by direction. Their lawsuit

against Commonwealth was to be dismissed so their lack of right against Commonwealth had been judicially established. The record discloses that the plaintiffs had filed a suit against the Killeleas and Nessingers (case No. 74—L—885) so if the plaintiffs possess any right of recovery it may well be determined in that action. We agree with the trial court that the petition for equitable distribution should have been dismissed.

For the reasons stated the decisions of the circuit court of La Salle County are affirmed.

Affirmed.

ALLOY and BARRY, JJ., concur.