BOARD OF TRADE OF THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* DOW JONES & COMPANY, INC., Defendant-Appellant.

First District (2nd Division)   No. 82—1378

Opinion filed August 17, 1982.

682

Lawrence Gunnels, of Reuben and Proctor, of Chicago, and Robert Sack, Thomas C. Morrison, and Robert P. Lobue, all of Patterson, Belknap, Webb and Tyler, of New York, New York, for appellant.

James M. Amend, Robert G. Krupka, and Donald W. Rupert, all of Kirkland and Ellis, of Chicago, for appellee.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff Board of Trade of the City of Chicago (the Board) brought a declaratory judgment action in the circuit court of Cook County seeking a declaration that its proposed stock market index contract, which is based on the stock market index and averages devised and published by defendant Dow Jones & Company, Inc. (Dow Jones), would not violate any proprietary rights of Dow Jones. After a bench trial, the court held that the proposed actions of the Board would violate no rights of Dow Jones. On appeal, Dow Jones contends that: (1) the trial court erred by placing the burden of proof on Dow Jones; (2) the circuit court should have declined to hear the case; (3) the trial court's decree requires correction; (4) the contract between the parties, which is termed a "subscription agreement," does not authorize the Board's proposed use of the Dow Jones Averages; (5) the Board is guilty of unfair competition under the law of New York and Illinois; (6) the Board is guilty of a violation of section 43(a) of the Lanham Act; (7) the Board is guilty of contributory trademark infringement; and (8) the Board is guilty of common law misappropriation.

The Board of Trade of the City of Chicago is a not-for-profit, nonstock membership corporation created in 1859 pursuant to a special charter from the Illinois legislature. The corporation was organized for the purpose of maintaining an exchange for the trading of commodity futures contracts. The Board is the oldest and largest such exchange in the United States, and today the Board offers a wide variety of contracts in agricultural products, precious metals and financial instruments. The business of the Board, and all trading on its exchange, is conducted at the Board of Trade building on Jackson Boulevard in Chicago. The activities of the Board, and of all other commodity exchanges in the United States, are regulated by the Commodities Futures Trading Commission (CFTC), a Federal agency. The CFTC must approve any futures contract which is traded on an exchange, and no exchange may trade in a contract until the CFTC has designated it as a contract market for that contract.

Dow Jones is a Delaware corporation with its principal office in New York City. It is primarily a news gathering and publishing organization. Dow Jones publishes the *Wall Street Journal, Barron's* and the *Asian Wall Street Journal*, and operates several wire services

which transmit financial news to subscribers by means of ticker tape, computer linkups and the like. The Dow Jones activity which is relevant to this case is its computation of the Dow Jones Averages, in particular the Dow Jones Industrial Average. Dow Jones has been producing and publishing a price average of industrial stocks since 1896. The average has encompassed the stock issues of 30 separate highly capitalized industrial companies since 1928. The identity of the firms whose stocks make up the average has changed from time to time over the years. The selection of stocks used to compute the average is arrived at through the use of considerable financial expertise and experience and is based on Dow Jones' determination of which stocks are likely to reflect the overall activity of the stock market in their individual fluctuations in price. The Dow Jones Industrial Average is computed by adding together the current prices of the 30 constituent stocks and dividing the total by a number called the "divisor." The purpose of the divisor is to retain continuity in the overall average. The divisor is adjusted to account for changes in per-stock value which are caused by technical factors such as stock splits or stock dividends. The use of the divisor keeps the average within a range of numbers which is recognizable as the "Dow Jones Average" to the public. The divisor, list of stocks and method of calculating the average are all made public by Dow Jones. Dow Jones itself computes the value of its index once a day. Licensees of Dow Jones compute the value of the index on a "real time" basis throughout the day and disseminate that information via television, tape and electronic readouts to a large number of subscribers, including banks, brokerage houses, securities exchanges and commodities exchanges. The Board is a subscriber to such a service and, pursuant to that subscription, it displays the "real time" Dow Jones Average on its trading floor in order to aid its traders in making investment decisions. It is undisputed, as are most of the facts in this case, that the Dow Jones Averages have achieved high public regard as a source of information about the current performance of the stock market.

The events leading up to this litigation began in February 1980 when the Board submitted a proposal to the CFTC which asked that it be designated as a contract market for several new futures contracts which were to be based on indices composed of groups of stocks listed on the New York Stock Exchange. The indices were formulated entirely by the Board after two years of research and labor. In December 1981, the CFTC entered into a jurisdictional agreement with the Securities and Exchange Commission. Part of that agreement allowed the CFTC to permit trading on stock market index con-

tracts only if the contracts were based on widely known and well established stock market indices. This agreement effectively precluded CFTC approval of a contract based on any new indices, including the indices which had been devised by the Board.

The Board approached Dow Jones with a proposal that would have paid between $1 million and $2 million yearly to Dow Jones in return for its sponsorship of a contract based on its index. Dow Jones turned down the proposal for the asserted reason that it determined that any connection on its part with the speculative field of futures trading would damage its image as an advocate of conservativism in investment policy. Other prominent stock market indices, notably Standard & Poor's 500 and the Value Line Index, were licensed by their publishers to commodity futures exchanges for the purpose of trading a contract based on those indices at about the time that the parties here were negotiating.

On February 26, 1982, the Board submitted a proposal to the CFTC asking that it be designated as a contract market for a stock market index futures contract that would be based on the Dow Jones Industrial Index and Average. The contract would be called the Chicago Board of Trade Stock Market Index (CBT Index). The proposal specifies that the CBT Index is identical to the Dow Jones Industrial Index and Average. The contracts are to be settled four times a year, and the value of the CBT Index will be calculated only on the last day of each of those trading periods. The value of the contract is $50 times the value of the index (*i.e.*, the average) on the last day of trading, with "longs" (buyers) and "shorts" (sellers) settling the contracts through an exchange of certified promissory notes for the appropriate sum. Because the value of the CBT Index will be calculated only when the contracts are to be settled, the "spot" value of the contracts during the trading period will be ascertainable only through reference to the current Dow Jones Average. On May 13, 1982, the CFTC designated the Board as a contract market for the CBT Index contract.

While the Board's proposal was pending before the CFTC, the Board filed this action in the circuit court of Cook County, seeking a declaration that its proposed contract would violate no proprietary rights of Dow Jones in the index and averages. On June 4, 1982, the trial court issued a 27-page opinion, holding that the burden of proof in the declaratory judgment action should be on Dow Jones; that Dow Jones has a property right and a valuable interest in the Dow Jones Index and Averages and a wrongful use of that property is actionable at law and in equity; and that the Board's proposed use of the averages was not a misappropriation of Dow Jones' property and therefore

the Board was free to offer its CBT Index contract for trading. The court made this ruling conditioned on the use of a disclaimer on the CBT Index contract disavowing any association with or sponsorship by Dow Jones.

Dow Jones' first contention on appeal is that the trial court erred in determining that the burden of proof in the action should be placed on Dow Jones despite the fact that it was the nominal defendant in the declaratory judgment action. In allocating the burden of proof to Dow Jones, the trial court relied on *Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 173 N.E.2d 209, *rev'd on other grounds* (1962), 24 Ill. 2d 390, 182 N.E.2d 2096, which stated:

> "The general rule is that the burden of proof rests on the party who has the affirmative of the issue, as determined by the pleadings, and the usual test employed to determine on which side the burden of proof lies, is to ascertain which party would be entitled to a verdict if no evidence were offered." 29 Ill. App. 2d 323, 327.

■ As the trial court noted, what is generally termed "the burden of proof" has two aspects: (1) the burden of producing evidence as to a particular matter; and (2) the burden of persuading the trier of fact as to the existence of the fact asserted. The burden of producing evidence, which is sometimes called the burden of going forward, shifts from party to party during the course of a trial, but the burden of persuasion is always firmly allocated to one of the parties and does not shift. (*Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 639, 333 N.E.2d 50; see McCormick, Evidence sec. 336, at 784 (2d ed. 1972).) The trial court held that both of these burdens belonged to Dow Jones. The trial court stated that "[e]ven though Dow Jones is the defendant it has the affirmative issue. It must establish that certain of its proprietary rights in its Averages will be violated by the Board's proposed activity."

The pleadings in this case show the Board praying for a declaration that "[b]y offering the commodity futures contract described in paragraph 4, the Board of Trade will not violate any legal or proprietary right of Dow Jones." Dow Jones' answer sets forth several proprietary rights which allegedly will be violated by the Board's actions.

It is true that Dow Jones has the affirmative of the issue as it is framed by the Board. It has sometimes been said that a party is not required to prove a negative averment. (See *Williams v. Franks* (1973), 11 Ill. App. 3d 937, 939, 298 N.E.2d 401.) However, allowing the presence of a negatively phrased averment in a complaint to shift the burden of persuasion to the other party places "an entirely undue

emphasis on what is ordinarily purely a matter of choice of forms." (McCormick, Evidence sec. 337, at 786 (2d ed. 1972).) The ease of devising a positive phrasing of the issue is demonstrated in the paragraph of the Board's complaint which states that "this action *** seeks a declaration of the right of the Board of Trade to proceed to offer a commodity futures contract, as described below, without interference by Dow Jones." Our supreme court has stated:

> "The burden of proof does not depend upon the form of the proposition. The weight of authority is, that whoever asserts a claim or defense which depends upon a negative must establish the truth of the allegation [citation] for that particular fact is essential to his case." *Abhau v. Grassie* (1914), 262 Ill. 636, 638, 104 N.E. 1020.

The supreme court has also stated that the allocation of the burden of proof of a negative averment "must depend on its own peculiar circumstances. Where it is as easy for the plaintiff to prove the negative as it is for the defendant to disprove it, then the burden of proof must rest upon the plaintiff." *Hooper v. Talbot* (1931), 343 Ill. 590, 593, 175 N.E. 783.

The Board of Trade has clearly sought relief in this action. It is asking for a declaration, binding on Dow Jones, that it has the right to trade the CBT Index contract. In its complaint, it made the sweeping averment that its proposed course of action would violate no proprietary rights of Dow Jones. Insofar as it is helpful to contemplate what the result of this action would be "if no evidence were offered," it is clear that the Board would not be entitled to its declaration on the basis of the pleadings.

■ The trial court noted that Dow Jones has filed a complaint in the United States District Court for the Southern District of New York which sets forth as grounds for relief many of the matters which Dow Jones raised as defenses in the instant case,[1] and that counsel for Dow Jones stated before that court that the true posture of the case is that Dow Jones is the complaining party in the entire course of this litigation. It may be that Dow Jones is the complaining party

---

[1]*Dow Jones & Co. v. Board of Trade* (S.D.N.Y. 1982), 539 F. Supp. 190. On June 22, 1982, the district court dismissed all of Dow Jones' claims except its claim for copyright infringement. On July 16, 1982, that court denied Dow Jones' request for a preliminary injunction which would have prevented the Board's use and dissemination of a list of the stocks comprising the CBT Index. The court stressed that whether the Board's use of the averages or the trading of the index contracts were actionable under any theory other than copyright infringement were questions left to the courts of Illinois.

in some aspect of the extensive litigation between itself and the Board, but it seeks no affirmative relief here. The Board has taken the initiative in this court and the trial court by seeking a declaration of its right to do what it proposes. The facts in the instant case, though voluminous, are uncomplicated, and consist of information that was relatively accessible to both parties. The averments of the Board's complaint are as easily proven by the Board as they are disproven by Dow Jones. We hold that the burden of persuasion should have been allocated to the Board.

The trial court also held that the burden of producing evidence should fall solely upon Dow Jones. As has been previously noted, the burden of producing evidence shifts from party to party during the course of a trial. That burden, however, is initially assigned to the party who pleaded the existence of the fact to be proven. (See McCormick, Evidence sec. 336, at 784; sec. 338, at 791-93 (2d ed. 1972).) The Board's complaint alleges that the Board has "a right to trade," while Dow Jones' answer alleges rights that will be violated by the Board. The burden of producing evidence on these allegations should have been shared at least to some extent by the parties. We find that the trial court erred in assigning the entire burden of producing evidence to Dow Jones.

■■ Dow Jones also contends that the trial court erred in finding that the subscription agreement between the parties authorized the Board's proposed use of the Dow Jones Index and Averages. The subscription agreement entitles the Board to receive the Dow Jones News Service at prevailing monthly rates, and to use the information received from the service. Under that contract, the Board agrees not to redistribute the news service for 24 hours after its receipt, to install and maintain Dow Jones equipment for the transmission of the service and to allow Dow Jones to inspect the transmission and display equipment. The information provided by the news service includes new items from Dow Jones and other press associations, and the current Dow Jones Averages from Dow Jones and its licensees. The agreement introduced into evidence is a standard Dow Jones form contract which was executed on April 24, 1978, for a term of three years, which term automatically renews itself.

It is clear from the face of the agreement that Dow Jones is contracting to sell informational services to its subscribers, who may use the information provided they do not redistribute it for 24 hours after its receipt. The Board contends that its use of the averages as a trading vehicle is within the "uses" contemplated by the agreement.

It is undisputed that the current agreement, or one like it, has

been in effect for many years. Under the agreement, Dow Jones has transmitted financial information to the Board which the Board has displayed to its customers. Assuming that the word "use" in the contract creates an ambiguity which justifies judicial construction, the actual conduct of the parties under the contract makes it clear that the "use" contemplated when the contract was entered into was "use" of the service as information. The courts will adopt a reasonable construction of a contract which is placed on the contract by the conduct of the parties. (*Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 81, 195 N.E.2d 137.) Where there is doubt concerning the construction to be afforded a contract, the interpretation which parties by their acts under the contract have given it has weight and will be controlling provided that the plain meaning of the contract is not contradicted. (*Moran v. Commonwealth Edison Co.* (1979), 74 Ill. App. 3d 964, 973, 393 N.E.2d 1269.) In the instant case, the use of the Dow Jones News Service by the Board has been as an informational service only for all the years that the contract has been in force. The construction of the contract by the parties negates the contention that the use of the averages as a trading vehicle is authorized by the contract. This conclusion is supported by the fact that stock market index contracts are the newest innovation in the relatively young field of financial futures trading. This use of the averages became a commercial possibility only recently, and such use could not have been part of the bargain when the contract was formed. We find that the trial court erred in finding that the subscription agreement authorizes the Board to use the Dow Jones Averages as the basis for the CBT Index contract.

■■ ■ Dow Jones urges several other points of error as grounds for reversal; however, the dispositive body of law in this case is the common law doctrine of misappropriation. The parties base their theories concerning this body of law upon the law of Illinois, New York, and other jurisdictions. It should be noted at the outset that misappropriation is a species of unfair competition. Unfair competition is a tort (*Data Cash Systems, Inc. v. JS&A Group, Inc.* (N.D. Ill. 1979), 480 F. Supp. 1063, 1071), and the law of the State with the most significant relationship to the parties and to the relevant occurrence governs the action. (*Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 45, 262 N.E.2d 593.) Dow Jones, a Delaware corporation headquartered in New York, has offices and a registered agent in Illinois. It transmits its averages into Illinois directly and through licensees, where the Board proposes to make use of them as the basis of the CBT Index contract. The Board does business solely in Illinois, and the contract will be traded exclusively in Illinois. Illinois has the most significant relationship of any

State to the parties and to the Board's proposed activities and, therefore, Illinois law properly governs this action.

■■ The doctrine of misappropriation is recognized in Illinois. (See *Capitol Records, Inc. v. Spies* (1970), 130 Ill. App. 2d 429, 434, 264 N.E.2d 874.) However, any discussion of the doctrine must make repeated reference to the law of other jurisdictions, particularly New York, where the doctrine has been most fully delineated.

The doctrine was first enunciated by the United States Supreme Court in the case of *International News Service v. Associated Press* (1918), 248 U.S. 215, 63 L. Ed. 211, 39 S. Ct. 68. In that case, the defendant news service received reports pertaining to World War I, which were transmitted over a "wire" by the plaintiff. Defendant copied the news stories and transmitted them to its subscribing newspapers on the west coast for publication. The defendant argued that the plaintiff lost the right to control the uses made of its news stories by virtue of the plaintiff's wide public dissemination of the stories, and that it had the same right as any purchaser of a newspaper containing the stories to communicate the information in the stories to others. The court stated that the rights of the defendant to use the information provided by the plaintiff should not be gauged by the rights of the plaintiff as against the general public, but should be evaluated by a consideration of the rights of the plaintiff and the defendant, competitors in the news business, as between themselves. (248 U.S. 215, 239, 63 L. Ed. 211, 221, 39 S. Ct. 68, 72.) The court further stated that the transmission of the stories for commercial use by the defendant involved the implicit admission that:

> "it is taking material which has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as his own is endeavoring to reap where it has not sown ***. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; ***. The transaction speaks for itself, and a court of equity ought not to hesitate long in characterizing it as unfair competition in business." 248 U.S. 215, 239-40, 63 L. Ed. 211, 221, 39 S. Ct. 68, 72-73.

The court went on to describe the new species of unfair competition that it had created:

> "[D]efendant's conduct differs from the ordinary course of un-

fair competition in trade principally in this that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own." 248 U.S. 215, 242, 63 L. Ed. 211, 222, 39 S. Ct. 68, 73.

As the Board points out, the majority of the cases applying the misappropriation doctrine involve direct competition between the parties, an element which is missing in the instant case. However, it has been stated that:

"The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement." *Metropolitan Opera Association, Inc. v. Wagner-Nichols Recorder Corp.* (Sup. Ct. 1950), 199 Misc. 786, 796, 101 N.Y.S.2d 483, 492, *aff'd* (1951), 279 App. Div. 632, 107 N.Y.S.2d 795.

In the *Metropolitan Opera* case, the defendant was engaged in the practice of recording performances of the plaintiff opera company from the radio and manufacturing and selling phonograph records of those performances. The opera association licensed the exclusive right to make and sell recordings of its performances to Columbia Records, also a plaintiff in the case. Although the defendant was in direct competition solely with Columbia, the court found the defendant guilty of unfair competition as to both plaintiffs. As to the opera company, the court held that the defendant was unjustifiably interfering with its contract with a third party (199 Misc. 786, 803, 101 N.Y.S.2d 483, 498), as well as violating the opera company's right to control its name and reputation (199 Misc. 786, 797-98, 101 N.Y.S.2d 483, 494-95).

There can be no question but that the name and reputation of Dow Jones figures heavily in the Board's plans. The Board can gain CFTC approval for a stock market index contract only if the contract is based on a widely known and well established stock index. When the Board became aware that the index which it had devised could not be used as the basis for its contracts, it approached Dow Jones in order to secure Dow Jones' sponsorship of the contracts. When Dow Jones rejected this offer, the Board proposed the CBT Index. The CBT Index is based directly on the Dow Jones Index and must in all events perform identically to the Dow Jones Index. The "spot" value of the CBT Index can be ascertained only from the "real time" Dow Jones value displayed on the trading floor of the Board of Trade. Although the contract itself will not use the trade name "Dow Jones," except to disclaim any con-

nection with that company, the value of the contract at any particular time during the trading period will be ascertained by traders by reference to the Dow Jones Average. It is clear that the trading public will be entirely aware that trading the CBT Index contract is the same as trading a Dow Jones Index contract, and whatever aura of reliability, respectability, or expertise would adhere to a Dow Jones contract, if one existed, will adhere to the CBT Index contract, with or without the use of the Dow Jones name.

Not every commercial use of the name and reputation of another is an actionable misappropriation. In *National Football League v. Governor of the State of Delaware* (D. Del. 1977), 435 F. Supp. 1372, the State of Delaware was conducting a lottery called "Scoreboard" which essentially required players to bet on the final scores of N.F.L. games. The court held that there was no actionable misappropriation in the use of the N.F.L. scores as the basis of the lottery. (435 F. Supp. 1372, 1378-80.) The court reasoned that although one has a right to reap the profits of one's business without interference, this right does not preclude others from profiting from the demand for "collateral" services created by the popularity of that business. (435 F. Supp. 1372, 1378.) The court also stated that the N.F.L.'s claim that the State was appropriating the N.F.L.'s "good will" or "reputation" was, in that case, simply another way of saying that the lottery was profiting from a demand to gamble on the outcome of N.F.L. games that the popularity of those games had created. (435 F. Supp. 1372, 1378.) The crucial distinction between that case and the case before us is that the product which the Board seeks to sell is not as "collateral" to the business of Dow Jones as the lottery was to the business of the N.F.L. The N.F.L. is in the business of presenting professional football contests of a high caliber to fans of that sport who watch the games in person or through the media. The games, not the scores, are the product that the N.F.L. offers for sale. The collection and dissemination of the scores is performed by the news media, and the N.F.L. does not "produce" those scores in any meaningful sense.

Dow Jones is in the business of collecting and tabulating financial information on companies which are carefully selected based on Dow Jones' financial expertise and acumen. That information is filtered through a "divisor" of Dow Jones' invention, and by that process the raw figures which were originally collected are freed from distortions which reflect factors other than the objective economic performance of the stocks in the index. Finally, Dow Jones is in the business of disseminating the resultant average to investors. The use of the Dow Jones Index as the basis for the CBT Index contract is a far cry from the use

of football scores as the basis for a lottery. Traders in the contract are not merely "betting" on the index "numbers." The Board asserts that institutional investors and others will use the CBT contract as a "hedge," that is, to manage the risk in their stock portfolios. The strong correlation of the Dow Jones Average to the general pattern of stock market activity is essential to the usefulness of the CBT Index contract as a hedging device, and it is that correlation which will give "hedgers" confidence in the contract. That correlation exists solely as a result of Dow Jones' expertise, and has garnered considerable good will and respect for Dow Jones in the minds of the public. If a less reliable index and average were used, the CBT Index contract would be no more than a gambling device and would not gain CFTC approval. Thus, the Board's use of the Dow Jones Averages is not a "collateral" service or product which utilizes the good will of Dow Jones in an attenuated fashion.[2] The use of the Dow Jones Averages is not aimed at appealing to that segment of the public which is interested in the activities of Dow Jones. The contract is intended to appeal to the customers of the Board who are interested in trading stock market index futures, and the contract is designed to give those traders the sense of confidence that knowing that the contract is identical to a "Dow Jones contract" will surely produce.

Recently, the United States District Court for the Southern District of New York, Judge Milton Pollack presiding, granted Standard & Poor's Corporation's request for a preliminary injunction to prevent Commodity Exchange, Inc. (Comex) from trading in its proposed "Comex 500" contracts. (*Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.* (No. 82-2545, S.D.N.Y. May 13, 1982), 14 Sec. Reg. & L. Rep. 976, *aff'd* (2d Cir. 1982) 683 F.2d 704.)

---

[2]Good will is recognized as a business asset, and it figures significantly in the valuation of a business. (See *White v. White* (1981), 98 Ill. App. 3d 380, 383-84, 424 N.E.2d 421; see also Annot., 48 A.L.R. 3d 430, 479, sec. 12(b) (1973).) Harm done to the good will of a business has been recognized as a proper element of consequential damages in actions sounding in contract (*Stott v. Johnston* (1951), 36 Cal. 2d 864, 871, 229 P.2d 348, 352), and in tort (see *Lowrey v. Dingmann* (1957), 251 Minn. 124, 128, 86 N.W.2d 499, 502). When a business is sold, its good will can be transferred along with its other assets. (See *Mohawk Maintenance Co. v. Kessler* (1981), 52 N.Y.2d 276, 283, 419 N.E.2d 324, 328-29.) It follows that, in some circumstances, the good will of a business can be appropriated to another's use, and a wrongful appropriation of that property right is actionable. *Cf. Mohawk Maintenance Co. v. Kessler* (1981), 52 N.Y.2d 276, 284-85, 419 N.E.2d 324, 329 (holding that the seller of a business implicitly transferred a property right in the firm's good will to the buyer, and that the seller could not then impair that right by actively soliciting the customers of his former business). Accord, *Ranft v. Reimers* (1902), 200 Ill. 386, 394, 65 N.E. 720.

The Comex 500 contract was based on Standard & Poor's 500 (S&P 500) Stock Index. The holding in that case was the subject of extensive analysis by the trial court, and that case has been thoroughly briefed in this court. The facts of that case can be summarized as follows. Beginning in 1979, Comex entered into negotiations with Standard & Poor's (S&P) in order to obtain a license to trade stock market index contracts based upon the S&P 500. S&P ultimately granted a license to trade in such a contract to the Chicago Mercantile Exchange. In December 1980, Comex applied to the CFTC for designation as the contract market for the Comex 500 contract. In the application, Comex referred to the "Comex 500" and the "S&P 500" interchangeably. Comex never proposed to calculate or use its own index of 500 stocks, instead stating that its contract was to be quoted in terms of and settled on the basis of the current quotation for the S&P 500. Prior to the CFTC ruling on the contract, Comex published a brochure featuring S&P's name prominently and stating that the Comex 500 was to be settled based on the S&P 500. The court found that Comex planned to use the S&P name and reputation in a way that would cause confusion as to the sponsorship of the contract, and that Comex' proposed use of the S&P 500 was a misappropriation of S&P's property without authority from and over the objection of S&P.

The trial court, in the instant case, found that the S&P case was distinguishable for four reasons: (1) Unlike Dow Jones, S&P does not make the method by which its index is calculated completely public. Although the list of stocks in the index and the general formula for computing the average are public knowledge, the "real time" calculations of the index by S&P's licensees depend on the input of confidential information provided by S&P. The court found that this factor makes it impossible to calculate the S&P Index without the "direct participation" of S&P, while the Dow Jones Index may be calculated without any secret information from Dow Jones; (2) The name of the Comex 500 contract is perilously close to the S&P 500 trademark. In the instant case, the Board's contract was to make no use of the Dow Jones name, although the disclaimer required by the trial court will have the effect of placing Dow Jones' name on every contract; (3) Comex never disclaimed an association with S&P. Instead, it tried to create the impression that the contract was sponsored by S&P. The Board does and will continue to disclaim any association with Dow Jones; and (4) Comex used the S&P name to promote the contract, while the Board will make no promotional use of the Dow Jones name.

The distinctions drawn by the trial court as to the differing use by the two exchanges of the trademarks and trade names of the index producers are significant. The absence of the Dow Jones name from the Board's promotional materials and the use of an unambiguous disclaimer of sponsorship clearly make the Board's planned activity less egregious than Comex'. The use of the disclaimer may obviate any possible confusion as to the sponsorship of the contract, although this court has noted that a disclaimer does not adequately protect the rights of the complaining party if the connection inherent in the product itself is sufficiently strong. (See *N.F.L. Properties, Inc. v. Consumer Enterprises* (1975), 26 Ill. App. 3d 814, 819, 327 N.E.2d 242; *N.F.L. Properties, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.* (1975), 26 Ill. App. 3d 820, 824, 327 N.E.2d 247.) However, the misappropriation complained of in this case is not a misappropriation of Dow Jones' name, but of the property right of Dow Jones in its averages and the good will and public respect attendant to them.

The trial court's finding that there is no appropriation of the Dow Jones Averages because the Board can and will compute the averages itself creates a distinction without a difference between the actions of the Board and Comex. At the close of trading in each CBT Index contract, the Board, through the Chicago Board of Trade Clearing Corporation, will tabulate the stock prices of the companies comprising the CBT Index on that date, which will be the same companies comprising the Dow Jones Index on that date. The Board will apply the CBT divisor in use on that date, which will be the Dow Jones divisor in use on that date. The final figure will be the closing value of the CBT Index, which will be the closing value of the Dow Jones Index on the last trading day. The fact that this type of mechanical calculation could not be performed using the S&P 500 is not the point. The value of the Comex 500 contract is the closing value of the S&P 500 on the last day of trading; the value of the CBT Index contract is the closing value of the Dow Jones Index on the last day of trading. The CBT Index, by the terms of its CFTC approval, must be identical to the Dow Jones Index in all of its features at all times. During the trading period, traders can refer to the "real time" value of the Dow Jones Index and know to a certainty that the "spot" value of their contracts is identical to the value of that index without the slightest deviation. The fact that the Board is willing and able to perform a rote calculation of the index value four times a year does not make the index and average its creation or its property, and that occasional calculation does not make the CBT Index and Average any less the Dow Jones Index and Average.

It should be noted that there is another distinction between the S&P case and the instant case. S&P is a party to a licensing agreement with the Chicago Mercantile Exchange under which that exchange trades in an "S&P 500" contract. Dow Jones has entered into no such agreement with an exchange for the use of its averages. The fact that an appropriation of a property right, if permitted, would interfere with the contractual relations of the owner of the property right and a third party has been considered a significant factor in some cases applying the misappropriation doctrine. (See *New York World's Fair 1964-1965 Corp. v. Colour Picture Publishers, Inc.* (1964), 21 App. Div. 2d 896, 896-97, 251 N.Y.S.2d 885, 886; *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.* (S. Ct. 1950), 199 Misc. 786, 795-96, 101 N.Y.S.2d 483, 498, *aff'd* (1951), 279 App. Div. 632, 107 N.Y.S.2d 795; *Madison Square Garden Corp. v. Universal Pictures Co.* (1938), 255 App. Div. 459, 466, 7 N.Y.S.2d 845, 850.) In the instant case the existence or nonexistence of a license between Dow Jones and another exchange is not a determinative factor. It is clear from the arrangements made between other index producers and other exchanges, and from the offer made by the Board to Dow Jones, that there is a valuable market for any license that Dow Jones might care to grant for trading in a Dow Jones Index contract. Dow Jones has chosen not to avail itself of this market. A party which is free to deal is free not to deal. An existing licensing agreement with a third party which would be hampered or impaired by the Board's activities would add another species of tortious conduct to this case, but would add nothing to the analysis of whether or not the property of Dow Jones is being misappropriated by the Board.

■■ The trial court found that Dow Jones has a proprietary interest in its averages, and that finding is undisputed by the parties. The Board's proposed use of the Dow Jones Index and Averages under the name of "the CBT Index" is closely analogous to what has been described as "reverse passing off," that is, an appropriation of the product while disclaiming its source. (See *Smith v. Montoro* (9th Cir. 1981), 648 F.2d 602, 606.) Whether the occasional calculation of the value of the index by the Board is enough to prevent the use of the Dow Jones Index from being a "reverse passing off" which is actionable under section 43(a) of the Lanham Act need not be determined by this court. The Board's conduct is within the boundaries of the doctrine of misappropriation. That doctrine will extend to protect the complaining party from unfair competition or trade practices regardless of how novel or ingenious those practices are. (*Madison Square Garden Corp. v. Universal Picture Co.* (1938), 255 App. Div. 459,

467, 7 N.Y.S.2d 845, 852.) The doctrine is "adaptable and capacious" and has been described as "encompassing any form of commercial immorality." (*Standard & Poor's Corp. v. Commodity Exchange, Inc.* (2d Cir. 1982), 683 F.2d 704, 711, quoting *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.* (2d Cir. 1982), 672 F.2d 1095, 1105, *cert. pending* (U.S. May 14, 1982), 50 U.S.L.W. 3936.) The controlling question in a misappropriation case is whether the commercial practice at issue is fair or unfair. *Fisher v. Star Co.* (1921), 231 N.Y. 414, 427, 132 N.E. 133, 137.

■■ The facts in the instant case amply demonstrate that the appropriation of the Dow Jones Index and Averages by the Board for use as a trading vehicle is unfair. We hold that the Board's proposed actions are a misappropriation of the Dow Jones Index and Averages.

For the reasons expressed herein, the judgment of the circuit court of Cook County is reversed.

Reversed.

DOWNING and HARTMAN, JJ., concur.