FLEET MANAGEMENT SYSTEMS, INC., d/b/a Logistic Systems, Plaintiff,

v.

ARCHER–DANIELS–MIDLAND CO., INC., and Nims Associates, Inc., Defendants.

No. 83–3060.

United States District Court, C.D. Illinois, Springfield Division.

Jan. 28, 1986.

R. Gerald Barris, Springfield, Ill., Richard M. Zinner, Boston, Mass., for plaintiff.

David L. Johnson, Whitley, Fuller, Suter, Hopp, Barr & McCarthy, P.C., Decatur, Ill., F. Whitten Peters, Washington, D.C., for defendants.

## ORDER

MILLS, District Judge:

The cardinal issue: RICO.

This matter is before the Court upon Defendant's motion to dismiss Count VI of Plaintiff's amended complaint, which alleges that Defendants have engaged in a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Fleet Management Systems, Inc., d/b/a Logistics Systems (Logistics) charges that Archer-Daniels-Midland Co., Inc. (ADM), and NIMS Associates, Inc., (NIMS), violated 18 U.S.C. §§ 1964(c) and (d), as well as state common law and federal copyright law, when they participated in a scheme to fraudulently misappropriate and market a computer program that Logistics had licensed to ADM.

Also before the Court is Defendant's motion for partial summary judgment as to Count V of Plaintiff's complaint in which Logistics charges that Defendants' scheme to misappropriate the computer program violates the provisions of the Massachusetts Unfair Competition Statute, M.G.L.A., ch. 93A, § 2.

### Facts

The property allegedly misappropriated by the Defendants is a computerized truck routing system called "CompuMap". The system allows a user to readily determine the most efficient route between any two of over 9,400 points in the United States

and Canada (Complaint ¶ 4). The Compu-Map system itself consists of a data base and a computer program by which the data base is accessed in order to provide the route information desired by the operator. (Complaint, Exhibit A)

According to Logistics' complaint, the CompuMap system is a highly innovative solution to the problem of routing in the trucking industry. In an effort to restrict access to the proprietary aspects of the system, Logistics requires each of its customers to sign a license agreement. Pursuant to this agreement, each customer agrees to take all steps necessary to maintain the confidentiality of the system; and that if requested by Logistics, the customer will immediately destroy all physical aspects of the system and purge all other media from its computers. (Complaint, ¶ 7, and Exhibit B)

In October of 1980, Logistics and ADM entered into a licensing agreement granting ADM a nontransferrable license to use the CompuMap program in its computer system. Logistics then installed the system on ADM's computer. Apparently the system did not satisfy ADM, and on December 7, 1981, a Mr. Crotinger (manager of Transportation Systems at ADM) sent a letter to Logistics cancelling the license agreement. In response to this letter, Ms. Broderick of Logistics wrote to Mr. Crotinger a letter specifying the following requirements for cancelling the contract:

1. Please purge all Software (programs and data) from your computer.

2. Please return all material, whether in hard copy, cards, disk, tape or other storage media to Logistics Systems.

3. Please send a written notarized confirmation signed by a duly authorized representative of your company, certifying that steps 1 and 2 above have been taken, that no other copies of any of the materials exist, and that the material you have forwarded constitutes everything that was in your possession.

By a letter dated January 29, 1982, in which Mr. Crotinger's signature was notarized, ADM responded as follows:

1. All CompuMap software has been purged from our computer.

2. All hard copy material that we have accumulated has been boxed up and returned to you UPS.

3. This letter has been notarized, thereby complying with your third requirement.

The letter further stated, "I am unable to send you our disk packs containing certain files relating to CompuMap; however, I certify with the notarized letter that *all* files have been purged."

The gravamen of Logistics' complaint is that ADM did not purge all information relating to CompuMap from its systems, and that ADM, in conjunction with NIMS, proceeded to use the system's information to market a truck routing system as the "NAI route system."

In support of its RICO claim, Logistics contends that the Defendants committed several acts of mail and wire fraud, and that the following such acts constitute a "pattern of racketeering activity" under 18 U.S.C. § 1962(c):

1. On September 25, 1980, Mr. Crotinger of ADM mailed to Logistics a letter and the original executed license agreement. (Complaint, Exhibits B and C.) Fraudulent representations in this correspondence include those provisions of the license agreement regarding ADM's intended use of the materials; and representations that Mr. Nims, to whom a copy of the correspondence was mailed, was an ADM employee. (Complaint, ¶¶ 15, 16, 50, and 51.)

2. Also on September 25, 1980, Mr. Crotinger of ADM mailed to NIMS a copy of his letter to Logistics and the executed license agreement, in furtherance of a conspiracy between ADM and NIMS to obtain Logistics' CompuMap system under false pretense and to defraud Logistics. (Complaint, ¶ 51.)

3. On June 25, 1981, Mr. Hainline of ADM mailed to Logistics a certification that the CompuMap source code had been purged from ADM's computer. As alleged in the Complaint, this certification was a

fraudulent misrepresentation in furtherance of "defendants' illegal and fraudulent taking of the CompuMap system in a manner otherwise than as permitted by Logistics." (Complaint, ¶¶ 18, 54, 55, 56, Ex. E.)

4. On December 7, 1981, Mr. Crotinger of ADM mailed a letter to Logistics cancelling the license agreement, allegedly because the CompuMap system "does not fit into our overall application structure adequately enough." In said letter, ADM represents that "we have taken the system out of production." (Complaint, ¶ 19, Ex. F.) Clearly, this letter was mailed in furtherance of Defendants' scheme to defraud Logistics.

5. On January 29, 1982, Mr. Crotinger of ADM mailed a letter to Logistics in which he gave sworn notarized certification that all CompuMap software and disk files had been purged from ADM's computer and that all hard copy material accumulated by ADM had been boxed up and returned to Logistics. These certifications are alleged in the complaint to be false and fraudulent misrepresentations, which were made to defraud Logistics. (Complaint, ¶¶ 21, 54, 55, 56, Ex. H.)

6. In or around August 1982, Mr. Rushton of NIMS had a series of telephone calls with Tri-State, a customer of Logistics, in which it is alleged that Mr. Rushton falsely represented himself to be a representative of NIMS and stated that he was interested in buying the CompuMap data base from Tri-State. (Complaint, ¶ 22.)

7. In November 1982, NIMS mailed promotional literature marketing its "NAI route system" to Ryder Systems, Inc. (a customer of Logistics) and to 1800–2100 other potential customers. (Complaint, ¶ 24, Ex. I.)

8. Mr. Winters of NIMS and Mr. Crotinger of ADM jointly engaged in a nationwide telephone campaign during 1982 to market the NIMS routing system.

According to Logistics, these allegations satisfy the RICO "pattern" requirement in that at least eight separate instances of mail or wire fraud have been charged spanning a period of more than two years. Conversely, ADM, citing *Northern Trust Bank/O'Hare v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985) contends that even assuming Plaintiff has validly stated eight instances of mail or wire fraud, these cannot constitute a pattern because a pattern requires at least two fraudulent schemes, and the predicate acts are all in furtherance of a single alleged scheme—the scheme to misappropriate Plaintiff's CompuMap system.

The issue as joined, therefore, is whether a "pattern" requires more than one fraudulent scheme, regardless of the number of acts necessary to achieve the objective of that scheme and, if so, whether more than one scheme is involved in the case at bar.

## "PATTERN OF RACKETEERING ACTIVITY"

### I.

Section 1964(c) grants a private right of action to any person "injured in his business or property by reason of a violation of section 1962." Section 1962, in turn, makes it unlawful to invest, in an enterprise engaged in interstate commerce, funds "derived from a pattern of racketeering activity," to acquire or operate an interest in any such enterprise through "a pattern of racketeering activity," or to conduct or participate in the conduct of that enterprise "through a pattern of racketeering activity." Section 1961 defines "racketeering activity" to mean any of numerous acts "chargeable" or "indictable" under enumerated state and federal laws, including the federal mail and wire fraud statutes. Section 1961(5) further states that "a pattern" of racketeering activity requires proof of at least two acts of racketeering within ten years.

Since the initial passage of the RICO statute, federal courts have been highly concerned with the expansive potential of the plain wording of the statute, which at first glance would appear to allow a federal cause of action in any case involving two or more related acts "indictable" under state

and federal law. Legislative history clearly indicates what Congress had in mind when it enacted RICO: to halt the infiltration of legitimate business by organized crime.[1] The problem Congress had was to word the statute so that it could achieve this goal without it being "void for vagueness" or overbroad in its application. *See, e.g., United States v. Aleman,* 609 F.2d 298, 302–06 (7th Cir.1979) (responding to such arguments against RICO as enacted).

Apparently, the "pattern of racketeering activity" requirement of the statute solved the vagueness problem. But in doing so, it covered activity that many courts could not believe was intended by Congress. The ABA Report on civil RICO explains that:

> [i]n an attempt to insure the constitutionality of the statute, Congress made the central proscription of the statute the use of a "pattern of racketeering activities" in connection with an "enterprise," rather than merely outlawing membership in the Mafia, *La Cosa Nostra,* or other organized criminal syndicates. "Racketeering" was defined to embrace a potpourri of federal and state criminal offenses deemed to be the type of criminal activities frequently engaged in by mobsters, racketeers and other traditional members of "organized crime". The "pattern" element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes. The "enterprise" element, when coupled with the "pattern" requirement, was intended by the Congress to keep the reach of RICO focused directly on traditional organized crime and comparable ongoing criminal activities carried out in a structured, organized environment. The reach of the statute beyond traditional mobster and racketeer activity and comparable ongoing structured criminal enterprises, was intended to be incidental, and only to the extent necessary to maintain the constitutionality of a statute aimed primarily at organized crime." ABA Report, at 71–72.

*See Sedima v. Imrex Co.,* —— U.S. ——, ——, 105 S.Ct. 3275, 3289, 87 L.Ed.2d 346 (Powell, J., dissenting).

The ABA Report makes it clear that RICO is intended to target organized crime, and not legitimate business. The wording of the statute, however, makes it possible for those involved in ordinary commercial disputes to file a racketeering charge against respected businessmen in federal court merely by alleging two acts of fraud involving the wires or mails. The reason for this is clear: the plain meaning of the statute in this circuit has traditionally been that any two acts of "racketeering activity" (such as mail and wire fraud) occurring within ten years of each other could constitute a "pattern of racketeering activity", so long as the acts are connected by some common scheme, plan, or motive. *See United States v. Starnes,* 644 F.2d 673, 677–78 (7th Cir.1981); *United States v. Weatherspoon,* 581 F.2d 595, 601–02 (7th Cir.1978).

A further problem is the presence of mail and wire fraud violations in the statute. This is probably the single most significant reason for RICO's broad sweep because in recent years, the Courts of Appeal have "tolerated an extraordinary expansion of mail and wire fraud statutes to permit federal prosecutions for conduct that some had thought was subject only to state criminal and civil law." *United States v. Weiss,* 752 F.2d 777, 791 (2d Cir.1985) (Newman, J., dissenting). For instance, cases such as *United States v. George,* 477 F.2d 508, 511 (7th Cir.1973), have held that a mail fraud violation requires only: (1) a scheme to defraud, and (2) use of the mails in furtherance of that scheme. The potential effects of reading two related mail or wire fraud violations as forming a "pattern" on our federal system are staggering

---

**1.** RICO was Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, whose stated purpose was "to seek the eradication of organized crime in the United States ... by establishing new penal provisions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."

and can lead to some totally unforeseeable results.[2]

One result has been that litigators, lured by the prospect of treble damages, are now turning to federal court in garden-variety fraud claims that would in the past have proceeded in state court. The fact that RICO requires two mailing or phone calls hardly poses much of a problem in even the most simple fraud case. In *Sedima v. Imrex Co., Inc.,* —— U.S. ——, 105 S.Ct. 3292, 3293, 87 L.Ed.2d 361 (1985), Justice Marshall's dissenting opinion envisions the federalization of broad areas of state common law of frauds and a displacement of important areas of federal securities law by a continued expansive reading of the RICO statute. *See, e.g., Ray v. Karris,* 780 F.2d 636 (7th Cir.1985) (Plaintiff alleges both securities fraud and RICO violations). In addition, the broad sweep of the statute's language has allowed it to be used more often against businesses with no ties to organized crime than against mobsters who were the intended target of the statute. As pointed out by Justice Marshall, the dislocations caused by such an expansive reading of the civil RICO provision are not just theoretical:

> In practice, this provision frequently has been invoked against legitimate businesses in ordinary commercial settings. As the Court recognizes, the ABA Task Force that studied civil RICO found that 40% of the reported cases involved securities fraud, 37% involved common-law fraud in a commercial or business setting. Many a prudent defendant, facing ruinous exposure, will decide to settle even a case with no merit. It is thus not surprising that civil RICO has been used for extortive purposes, giving rise to the very evils that it was designed to combat. Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 69 (1985) (hereinafter cited as ABA Report).
>
> Only 9% of all civil RICO cases have involved allegations of criminal activity normally associated with professional criminals. The central purpose that Congress sought to promote through civil RICO is now a mere footnote.[3]

105 S.Ct. at 3295.

In an attempt to halt the expansive march of the statute, numerous federal courts focused on elements other than the "pattern" requirement. For instance, many courts held that a civil RICO plaintiff must allege a special "racketeering injury" distinct from the injury that naturally flows from the predicate acts themselves. *See, e.g., Alexander Grant & Co. v. Tiffany Industries, Inc.,* 742 F.2d 408 (8th Cir. 1984). Other courts held that it must be alleged that the defendant has already been criminally convicted of the predicate acts of mail and wire fraud, or of a RICO violation. *See Sedima; S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482 (2d Cir.1984), *rev'd,*

---

**2.** For example, imagine a midwest college student who decides he is going to make some money selling his old automobile by turning back the odometer to 10,000 miles and states that it has been driven only to classes and back during the past year. In reality, however, the car has well over 100,000 miles on it and was just recently driven through the Florida Everglades by some of the college football team. This student then calls his friend, informing him of the deal, and sends him a follow-up letter. Under the current reading of the statute, these two acts of fraud—which are related to each other by this student's scheme—could constitute a "pattern of racketeering activity" and subject the student to prosecution as a mobster.

Such a result is patently absurd. Although the student has committed a crime, he certainly is not involved in the kind of ongoing criminal enterprise that characterizes mob activity. Although the statute's language arguably applies to the foregoing example, Congress certainly did not intend that result.

**3.** A further problem is that there is nothing comparable in civil RICO suits to the restraint on the institution of criminal suits exercised by government prosecutorial discretion. For instance, the United State's Attorney's Manual § 9–43–120 (Feb. 16, 1984) states that only where a scheme is directed at a "class of people or the general public" and includes "a substantial pattern of conduct," will "serious consideration be given to mail fraud prosecution." In all other cases, "the parties should be left to settle their differences by civil or criminal litigation in the state courts." *Sedima,* 105 S.Ct. at 3294 (Marshall, J., dissenting).

—— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346.

These approaches, however, were expressly held improper by the Supreme Court in *Sedima*, as they went far beyond the clear wording and legislative history of the statute. In so holding, the high court recognized the concerns underlying these courts of appeals decisions:

> Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous", uses to which civil RICO has been put. 741 F.2d, at 487. Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises'." *Ibid.* Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises. *United States v. Turkette,* [452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ], *supra.* The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. Nor does it reveal the "ambiguity" discovered by the court below. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Haroco, Inc. v. American National Bank & Trust Co. of Chicago* [747 F.2d 384 (7th Cir.1984) ], *supra,* at 398.

105 S.Ct. at 3287. Thus, the Supreme Court spoke broadly in rejecting the remedies adopted by the lower court in *Sedima*, stating that the breadth of RICO's language is a defect "inherent in the statute as written, and its correction must lie with Congress." *Id.*

With the rejection of lower court decisions attempting to narrow the statute, RICO is becoming the vehicle for a federal cause of action in common law fraud cases, possible triple damages and attorney's fees, and a method by which legitimate businessmen are being labeled "racketeers". The Supreme Court, however, did not rule out the possibility of narrowing the statute; rather, it did not believe "that the amorphous standing requirement imposed by the Second Circuit effectively responds to those problems ..." *Id.* at 3287. And, as pointed out by the majority opinion in *Sedima*, it is clear that "in its private civil version, RICO is evolving into something quite different from the original conception of its enactors." *Id.*

## II

The fundamental question, then, is whether the apparently unambiguous language of the statute can (and should) be read in a manner consistent with this clear legislative history. In *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court noted that in construing the scope of a statute, its language, if unambiguous, must be regarded as conclusive "in the absence of 'a clearly expressed legislative intent to the contrary.'" *Id.* at 580, 101 S.Ct. at 2527, (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

In view of the definitional problems associated with a statute aimed solely at organized crime, this Court believes that the "pattern" requirement—though arguably unambiguous on its face—should be defined consistent with Congressional intent.

A pattern requirement that is properly developed to comport with Congressional intent is clearly the best approach in light of *Sedima*'s message. As previously noted, the Supreme Court in *Sedima* was well aware of the fact that although the statute should be "liberally construed to effectuate its remedial purposes," 105 S.Ct. at 3286, the statute has been used to reach cases well beyond what Congress intended. In the Court's view:

> The "extraordinary uses to which civil RICO has been put appear to be primarily the result of the breadth of the predi-

cate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of "pattern".

105 S.Ct. at 3287. This statement provides a clear invitation to define the "pattern" requirement consistent with legislative intent. Congress has unequivocally mandated that mail and wire fraud be included as predicate offenses; this cannot be altered. The concept of "a pattern of racketeering activity", however, can and should be read narrowly to confine its reach to the type of conduct Congress had in mind.

### III

The legislative history gives some indication as to how the "pattern" requirement should be interpreted. It is initially clear that the presence of the predicate acts is only a threshold inquiry. Something more is required for a "pattern" to be proved. Footnote 14 of the majority opinion in *Sedima* bears out this view:

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires at least two acts of racketeering activity,"* § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." *The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.* As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term

'pattern' itself requires the showing of a relationship ... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern ..." 116 Cong.Rec. 18940 (1970) (statement of Sen. McClellan). See also *id.*, at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d 616 (1975).

In addition, the ABA Report states that "[t]he 'pattern' element of the statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes." ABA Report, at 72. As explained by the Senate Report, the bill was not aimed at sporadic activity; rather, "the infiltration of legitimate business normally requires more than one 'racketeering activity' *and* the threat of continuing activity to be effective. It is this factor of continuity *plus* relationship which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

The ABA Report suggests that to effectuate this legislative intent, "pattern" should be interpreted as requiring that (i) the racketeering acts be related to each other, (ii) they be part of some common scheme, and (iii) some sort of continuity between the acts or a threat of continuing criminal activity be shown. ABA Report, at 193–208. Judge Powell's dissenting opinion in *Sedima* concurs in this view and argues persuasively that "by construing 'pattern' to focus on the manner in which the crime was perpetrated, courts could go

a long way toward limiting the reach of the statute to its intended target—organized crime." *Sedima,* 105 S.Ct. at 3290 (Powell, J., dissenting).

Despite footnote 14 of *Sedima* and clear legislative indications that a "pattern" requires something more than two acts of racketeering activity, many courts continue to hold that *Sedima*'s broad language mandates the conclusion that any two related acts can constitute a pattern. For instance, in *R.A.G.S Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985), the Fifth Circuit rejected defendant's argument that two related acts of mail fraud were not sufficient to constitute a "pattern of racketeering activity." Stating that "the broad language of the statute and the *Sedima* decision provide us with clear guidance," the Court held that because the alleged acts of mail fraud were related, Plaintiff's complaint stated a civil RICO claim. Similarly, in *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985), a New York district court held that:

> Although it is true that "two isolated acts of racketeering activity do not constitute a pattern," *Sedima; S.P.R.L. v. Imrex Co.,* 105 S.Ct. 3275, 3285 n. 14 (1985), when two acts which relate *to each other* and arise out of the same scheme are alleged, the requirement of pleading a "pattern of racketeering activity has been met.

619 F.Supp. at 1170. *See also Systems Research, Inc. v. Random, Inc.,* 614 F.Supp. 494, 497 (N.D.Ill.1985). These cases all rely on what is perceived to be the unambiguous meaning of the words "pattern of racketeering activity" and *Sedima*'s broad language.

At least two courts, however, have reached a different result. In *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828 (N.D.Ill.1985), it is persuasively argued that the term "pattern":

> connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes

repeated criminal *activity,* not merely acts to carry out the *same* criminal activity. It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity".

In *Northern Trust,* the Court dismissed Plaintiff's RICO claim because although it alleged two acts of mail fraud in furtherance of a construction kickback scheme— Inryco's mailing the subcontract to Century and Century's mailing a kickback check to Ranke—the two specified acts involved only one kickback scheme. The Court further noted that even if the three additional kickback payments were also mail fraud violations, "they still implemented the *same* fraudulent scheme as the first two mailings—and the single scheme does not appear to represent the necessary "pattern of racketeering activity." 615 F.Supp. at 833.

This approach was applied one month later in *Morgan v. Bank of Waukegan,* 615 F.Supp. 836 (N.D.Ill.1985), where it was similarly held that a *single* plot to divest investors of their initial cash investment and their home (put up as security for loans for the venture) did not satisfy the "pattern" requirement even where numerous acts of mail and wire fraud committed over a four-year period were alleged in the complaint. The Court held that only if the complained-of acts could somehow be said "to represent repeated criminal *activity,* not merely repeated *acts* to carry out the *same* criminal activity" would the "pattern" requirement be met. 615 F.Supp. at 838. In apparent concurrence with the *Northern Trust* and *Morgan* approach is *Lipin Enterprises, Inc. v. Lee,* 625 F.Supp. 1098 (N.D.Ill.1985). In that case, it was held that a list of twelve alleged acts of mail and wire fraud were insufficient to establish a pattern. The Court continued:

> Plaintiff must allege ... more than isolated predicate acts or sporadic activity to show that the affairs of an enterprise were conducted through a pattern of racketeering activity... Citing the legis-

lative history of RICO, the Supreme Court recently stressed the factors of "continuity plus relationship" in a RICO "pattern" ...

*Id.* at p. 1100.

Clearly rejecting this last approach, however, is *Trak Microcomputer Corp. v. Wearne Brothers*, 628 F.Supp. 1089 (N.D. Ill.1985). In *Trak*, Plaintiffs charged the Defendants with at least two acts of mail and wire fraud in furtherance of a scheme to defraud the Plaintiffs and illegally obtain microcomputer technology from them. Citing *Northern Trust*, the Defendants argued that because only one scheme was involved, the Plaintiffs failed to allege a "pattern of racketeering activity". *Trak* rejected Defendants' argument and held as follows:

> This court agrees with Judge Shadur's analysis of RICO and *Sedima* insofar as it states that more than a mere counting of racketeering activity is necessary to determine whether a pattern of racketeering activity has been stated. The criminal acts must demonstrate both a continuity and a relationship. However, this court does not agree with the suggestion that a pattern of racketeering activity cannot be established with respect to a single fraudulent scheme.

> In determining the meaning of a pattern of racketeering activity, this court is bound to the language of the RICO statute. That act defines what a racketeering activity is. The act does not suggest that a pattern of racketeering activity means a pattern of fraulent schemes; it merely requires a pattern of racketeering activity. *Sedima* does not compel a contrary interpretation. Nothing in the language of *Sedima* suggests that in order to find a pattern of racketeering activity, a pattern of fraudulent schemes must be pled. Rather, *Sedima* only requires that the racketeering activity be continuous and related.

> This court finds that the plaintiffs have alleged a pattern of racketeering activity. Plaintiffs allege that the defendants engaged in numerous acts of racketeering activity which were continuous over an identified period of time and which were related to one another in furtherance of the alleged fraudulent scheme. These allegations satisfy the continuity plus relationship standard of *Sedima*.

*Id.* at p. 14–15.

It is this Court's view that *Sedima*, the language of the statute, and its legislative history not only allows, but indeed compels the conclusion that a "pattern" requires at least two criminal episodes by a racketeering enterprise that are somehow related by "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima*, 105 S.Ct. at 3285 n. 14 (quoting 18 U.S.C. § 3575(e)). More is clearly required that a relationship between predicate acts themselves: there must be two or more criminal episodes through which the enterprise achieves its illegal goal. As stated by the ABA Report, the "continuity plus relationship" test articulated in footnote 14 of *Sedima* requires in addition to a relationship between the predicate acts "some sort of continuity between the acts or a threat of continuing criminal activity..." ABA Report, at 193–208. The obvious purpose of the continuity plus relationship formulation is to narrow the "pattern" concept to reach RICO's intended goal—enterprises which utilize similar methods of operation and participants and whose victims are harmed in similar manners by the operation of the particular racket. It is this kind of a continuous, ongoing enterprise that poses the "threat of continuing criminal activity" and it is this kind of enterprise that civil RICO has as its primary target.

An isolated criminal episode, though accomplished through a number of fraudulent acts, does not evidence such a threat of continuing criminal activity. Nor does it evidence that an organized criminal enterprise is involved in the scheme. The reading of the "pattern" requirement in *Northern Trust*—which requires proof of at least

two criminal episodes—provides the required evidence that an organized pattern of criminal activity is involved.

■ In the case *sub judice*, Plaintiff alleges that Defendants have committed a number of mail and wire fraud violations in furtherance of a scheme to obtain Plaintiff's "CompuMap" computer information and market it under a different name. These specified acts alone, however, fail to establish the required "pattern of racketeering activity" because only one criminal episode is involved—the alleged scheme to illegally market Plaintiff's computer program under a different name. It can be seen that Plaintiff's allegations do not give rise to any inference that a criminal enterprise is involved in the alleged fraud. Similarly, a threat of ongoing criminal activity is not apparent from the allegation of this one scheme. Therefore, even assuming the truth of Plaintiff's allegations, as we must for the purposes of this motion, the allegations cannot establish the required "pattern of racketeering activity." (This, of course, does not mean that Plaintiffs are without a remedy. Plaintiffs are free to pursue a variety of remedies under state law.)

In adopting the above construction of the RICO statute, this Court is mindful of this recent statement by our Court of Appeals in *Ray v. Karris*, 780 F.2d 636 (7th Cir. 1985):

> It is important to reemphasize the commitment of this court to a broad and literal reading of RICO in accord with Congressional intent and the dictates of the Supreme Court and our past decisions...

*Id.*, at p. 645. As previously articulated, it is believed that the construction of the "pattern" requirement adopted by this Court does comport with both the literal wording of the statute, the Supreme Court's decision in *Sedima*, and the clear intent of Congress. Moreover, under this construction, traditional state law claims are not federalized, federal remedial schemes are not inevitably displaced or superceded, and ordinary commercial disputes are not transformed into racketeering cases.

It is therefore ordered that Defendant's motion to dismiss Count VI of Plaintiff's complaint is ALLOWED.

## MASSACHUSETTS LAW vs. ILLINOIS LAW

Plaintiffs next contend that Defendant's scheme to misappropriate and market Plaintiff's CompuMap system constitutes unfair and deceptive acts and practices as defined by § 2 of the Massachusetts Unfair Competition Statute, M.G.L.A. Ch. 93A, § 2. ADM, on the other hand, argues that the Massachusetts statute is inapplicable since an Illinois court would apply Illinois law to this case; and further, that even if Massachusetts law is applicable, it is exempt from liability under the statute's interstate commerce exception, M.G.L.A. Ch. 93A, § 3 (West 1984).

### I.

In diversity, a federal court must look to the law of forum in which it sits, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–23, 82 L.Ed. 1188 (1938), including the rules governing choice of law. *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941).

Plaintiff's initial argument is that the parties agreed, in section 12(F) of the license agreement, that Massachusetts law would govern any contractual disputes. Section 12(F) of the agreement states that "this agreement shall be governed by the laws of the Commonwealth of Massachusetts," and section 12(J) provides: "The provisions of [section] ... 12 shall survive any termination of this Agreement." Plaintiff contends that the breadth of this language and the explicit statement of its continuing effect make it clear that Massachusetts law should govern *any* post-termination dispute arising out of the contract, including the present action.

Under Illinois law, contractual choice-of-law clauses are generally given effect when the dispute involves *contractual* rights and duties. *Carter v. Catamore*

*Co., Inc.,* 571 F.Supp. 94, 95 (N.D.Ill.1983). For instance, the Restatement (Second) of Conflict of Laws § 187(2), which is applied by Illinois courts, see *Hofeld v. Nationwide Life Insurance Co.,* 59 Ill.2d 522, 529, 322 N.E.2d 454 (1975), provides for the application of the

> law of the state chosen by the parties to govern their *contractual rights and duties* ... unless either (a) the chosen state has no substantial relationship to the parties or the transaction ... or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue... (Emphasis added.)

While the contract provision contained in section 12(F) of the lease agreement clearly governs the parties' contractual rights and duties, it is not so clear that it should apply to an action sounding in tort, such as an action under the Massachusetts statute.

Plaintiff argues that the contract provision should apply because its Chapter 93A claim is grounded more in contract than in tort. Plaintiff contends, *inter alia,* that its Chapter 93A claim pertains principally to misrepresentations involving the license agreement, and to breach of contract. Therefore, Plaintiff argues, section 12(F) of the agreement should require the application of Massachusetts law, and thus, the application of the Massachusetts statute.

The approach urged by Plaintiff was expressly rejected by a Massachusetts district court in *Computer Systems Engineering, Inc. v. Oantel Corp.,* 571 F.Supp. 1365, 1370–71 (D.Mass.1983). In *Oantel,* the court explained that claims of unfair or deceptive acts or practices under Chapter 93A may be founded on acts that are associated with breach of contract, tort, or both—or neither. *See e.g., Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 704, 322 N.E.2d 768, 779 (1975) (noting that a § 9, M.G.L.A. ch. 93A action is "neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action, such

as tort for fraud and deceit"). Nonetheless, the Court held that all Chapter 93A claims should be treated as torts for choice-of-law purposes, regardless of the conduct underlying that claim. The Court, noting the lack of precedent directly in point, explained its rationale as follows:

> One might argue that the answer should depend on whether contract-like or instead tort-like elements of the ch. 93A claim predominate on the facts of the particular case... I believe it likely that Massachusetts courts will adopt a rule that ch. 93A claims, and especially those for multiple damages, though sometimes associated with breach of contract, are nevertheless on the whole more closely analogous to tort. *Thus, for choice of law purposes, ch. 93A claims should be treated uniformly, rather than on a case-by-case basis, in the same way as tort claims.* This conclusion is supported also by the fact that the stated and apparent objectives of the legislature in enacting ch. 93A are more compatible with tort than contract theory.

571 F.Supp. at 1370–71. (Emphasis added.) This Court agrees that Massachusetts would probably follow the *Oantel* approach.

However, it is unnecessary for us to adopt that approach *per se* because under either approach, Plaintiff's Chapter 93A claim in this case is most closely analogous to a tort claim. While breach of the leasing agreement may be involved, the gravamen of Plaintiff's complaint is the wrongful misappropriation and marketing of Plaintiff's computer program. It may very well constitute breach of the agreement to fraudulently misappropriate Plaintiff's computer program; however, a claim *under the statute*—as opposed to a simple contract claim—imposes tort-like duties upon those engaging in business dealings, and involves special remedies such as double or triple damages. Thus, Plaintiff's claim of unfair competition is more properly viewed as a tort claim than a contract action.

Because Plaintiff's Chapter 93A claim is primarily tortious in nature, the contract provision specifying Massachusetts law does not control the choice of law issue. The present dispute is not over provisions of the contract, nor does it involve contractual rights and duties. Plaintiffs have cited no cases, and we have found none, to suggest that a contractual choice of law provision can govern an unfair competition claim sounding in tort. On the other hand, a Delaware court, in *Data General Corp. v. Digital Computer Controls, Inc.*, 357 A.2d 105 (Del.Ch.1975), considered the identical issue and dismissed as irrelevant a contract provision stating that the contracts were governed by Massachusetts law:

> [T]he law of New Jersey, the place where the wrongful act of making ... an improper use by defendant of plaintiff's trade secrets applies in determining the nature and extent of the relief to be granted plaintiff, and *the fact that plaintiff has had its contract forms drawn so as to call for application of the law of Massachusetts in matters involving them is irrelevant.* (emphasis added)

For the reasons stated above, this Court agrees with the court in *Data General* that such a contract provision is irrelevant to an unfair competition claim. *Ergo*, the provision in the leasing agreement specifying Massachusetts law does not govern the choice of law question.

## II.

Because the contract provision does not control the issue of applicable law, the issue is whether, under Illinois choice of law principles, Illinois or Massachusetts law should apply to the facts of this case. In tort, Illinois—following the Restatement (Second) of Conflicts of Law—applies the law of the state with the most significant relationship to the transaction at issue. *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 595 (1970). In determining which state has the most significant relationship to the transaction, the Illinois Supreme Court has disavowed any mechanical approach to the problem, preferring instead to weigh the "interests and public policies of [each contact state] as they relate to" each transaction in issue. *Mitchell v. United Asbestos Corp.*, 100 Ill.App.3d 485, 55 Ill.Dec. 375, 380, 426 N.E.2d 350, 355 (1981). *See also In re Air Crash Disaster Near Chicago, Illinois*, 644 F.2d 594, 610–11 (7th Cir.1981).

Both Massachusetts and Illinois have significant contacts to the alleged misappropriation of Plaintiff's "CompuMap" computer program. Logistics is incorporated and has its sole place of business in Massachusetts. In addition, Logistics entered into and signed the lease agreement in Massachusetts, and prepared and shipped the computer equipment from its Massachusetts offices. On the other hand, the alleged wrongful acts themselves occurred in Illinois, where ADM has its principal offices, and where ADM allegedly did not purge the information relating to the "CompuMap" program from its computers.

ADM argues that although Illinois conflict-of-laws analysis has become more flexible in recent years, the locus of the Defendant's conduct remains the most important factor—especially in cases involving alleged misappropriation of trade secrets or proprietary information. *See, e.g., Data Cash Systems, Inc. v. JS & A Group, Inc.*, 480 F.Supp. 1063, 1071 (N.D.Ill.1979), *aff'd* 628 F.2d 1038 (7th Cir.1980). In *Data Cash*, the Court held that:

> In unfair competition cases, the principal location of the Defendant's conduct is the contact that usually is given the greatest weight in determining the state which has the most significant relationship. Restatement (Second) of Conflict of Laws § 145, comment f (1971).

Other decisions applying Illinois choice-of-law doctrine to misappropriation claims have similarly held that such claims should be governed by the law of the state where the alleged wrong was committed or the benefit was obtained by the Defendant. *See, e.g., Board of Trade v. Dow Jones & Co.*, 108 Ill.App.3d 681, 64 Ill.Dec. 275, 281,

439 N.E.2d 526, 532 (1982), *aff'd* 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983); *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.*, 66 Ill.App.3d 789, 23 Ill.Dec. 352, 362–63, 383 N.E.2d 1379, 1389–90 (1st Dist.1978); *Crown Industries, Inc. v. Kawneer Co.*, 335 F.Supp. 749, 761 (N.D.Ill.1971).

It is true that the locus of the Defendant's alleged conduct is an important contact under Illinois' current "interest analysis" approach. It is, however, not necessarily controlling. Illinois has clearly rejected a strict application of the traditional doctrine of *lex loci delicti*, under which the rights and liabilities of the parties are determined by the law of the state where the injury occurred. *Ingersoll v. Klein*, 46 Ill.2d at 46, 262 N.E.2d 593. In rejecting the *lex loci delicti* doctrine, the Illinois Supreme Court criticized it as ignoring "the interest which jurisdictions other than where the tort occurred may have in the resolution of particular issues." *Id.*

Illinois' current "interest analysis" approach focuses on the contacts listed in sections 6 and 145 of the Restatement:

Sections 6 and 145 of the Restatement (Restatement (Second) of Conflict of Laws §§ 6, 145 (1971)), provide as follows:

"§ 6.  Choice-of-Law Principles.

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

\*      \*      \*      \*      \*      \*

§ 145.  The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. *These contacts are to be evaluated according to their relative importance with respect to the particular issue.*" (Emphasis added.)

In analyzing these factors, Illinois requires more than a mere counting of contacts to determine which state has the "most significant relationship" to the transaction. Rather, what is required is "a consideration of the interests and public policies of potentially concerned states and a regard as to the manner and extent of such policies as they relate to the transaction in issue." *Mitchell v. United Asbestos Corp., supra*, 55 Ill.Dec. at 380–81, 426 N.E.2d at 355–56 (*citing Johnson v. Spider Staging Corp.*, 87 Wash.2d 577, 582, 555 P.2d 997, 1001 (1976)). This approach is based on the principle that "[c]ontacts obtain significance only to the extent they relate to the policies and purposes sought to be vindicated by the conflicting laws." *Id.*

Under § 145 of the Restatement, the first two contacts with the transaction—(a) the place where the injury occurred, and (b) the place where the conduct causing the

**564**

injury occurred—took place in Illinois. Factor (c), the domicile and place of business of the parties, points to both Illinois and Massachusetts. The last factor, the place where the parties' relationship is centered, likewise occurs in both states. In issue is the relative importance of those contacts in light of principles espoused by § 6 of the Restatement.

Those contacts and the state interests evoked by them indicate that both Illinois and Massachusetts have an interest in the resolution of the alleged wrongful conduct in this case. Moreover, both jurisdictions' interests are significant. Under part (c) of § 6, Massachusetts clearly has an interest in seeing that corporations within its borders are adequately compensated for tortious injuries. This interest, although based on fewer contacts, cannot for this reason alone be automatically deemed less significant. On the other hand, Illinois has a strong interest in controlling the conduct of those who take action within its borders, and an interest in affording the protection of its laws to its domiciliaries. The fact that the alleged wrongful conduct itself occurred in Illinois gives Illinois a significant relationship to the transaction in issue.

An evaluation of the contacts reveals that both Illinois and Massachusetts have an interest in the resolution of the issue in this case. And the basic policies behind the law of unfair competition in Illinois and Massachusetts are the same. The difference, however, lies in the fact that the essence of Plaintiff's complaint is the misappropriation itself—which took place in Illinois. Because of this fact, Illinois has a strong interest in seeing that such conduct occurring within its jurisdiction is met with an appropriate remedy. Further, Massachusetts' interest in insuring adequate compensation for corporations within its borders is protected by Illinois' strong interest in remedying and preventing deceptive business practices.

 Under the Restatement approach, therefore, Illinois has the "most significant relationship" to the instant transaction, and Illinois law should be applied to Plaintiff's unfair competition claim.

 Although Illinois law would otherwise govern Plaintiff's unfair competition claim, Count V of Plaintiff's complaint does not allege a violation of Illinois law; instead, it is brought solely pursuant to the provisions of § 2 of the Massachusetts Unfair Competition Statute. There being no factual disputes material to the choice of law question, Defendant's motion for partial summary judgment as to Count V will therefore be allowed.

In accordance with the foregoing, it is ORDERED that Defendant's motion for partial summary judgment as to Count V of Plaintiff's complaint is ALLOWED. It is further ORDERED that Defendant's motion to dismiss Count VI is ALLOWED.