March 31, 1993 UNITED STATES COURT OF APPEALS
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1690

NORTHEAST DATA SYSTEMS, INC.
Plaintiff, Appellant,

v.

McDONNELL DOUGLAS COMPUTER SYSTEMS COMPANY,
Defendant, Appellee.

ERRATA SHEET

Please make the following correction in the opinion in the
above case released on March 2, 1993:

Page 5, line 10: After the word "claims" at the end of the
sentence, add the following language:

See Caton v. Leach Corp., 896 F.2d 939, 943 (5th Cir.

1990) (breach of implied covenant claims are breach of
contract claims); Restatement (Second) of Contracts

176 comment e (1981).

March 2, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1690

NORTHEAST DATA SYSTEMS, INC.,

Plaintiff, Appellant,

v.

McDONNELL DOUGLAS COMPUTER SYSTEMS COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert B. Collings, U.S. Magistrate Judge]

Before

Breyer, Chief Judge,

Cyr and Boudin, Circuit Judges.

Roger S. Davis with whom Nancy Pitnof-Mahoney and Davis, Rubin &

Parker, P.A., were on brief for appellant.

Frederick W. Rose with whom Gianfranco A. Pietrafesa, and Young,

Rose, Imbriaco & Burke, P.C. were on brief for appellee.

March 2, 1993

-2-
2

BREYER, Chief Judge. In February 1976, Northeast

Data, a Massachusetts firm, entered into a contract with

Microdata, a California company. In the contract, Microdata

promised Northeast, among other things, that:

1) Northeast would become the "sole distributor"
for Microdata's "Reality" line of computer
parts and related software in seven
Massachusetts counties;

2) Microdata would properly service "Reality"
products after Northeast Data sold them to
end users;

3) Microdata would supply proper spare parts;
and

4) Microdata would pay Northeast a 10%
commission on any "Reality" products that
Microdata sold directly to end users in
Northeast's territory.

The parties' relationship subsequently deteriorated. And,

in January 1983, Microdata, claiming that Northeast had

failed to meet its contractual purchasing quota, terminated

the distributorship.

Northeast then brought this diversity action

(filed in state court then removed to federal court) against

Microdata. In its original complaint Northeast essentially

said that Microdata had broken its agreement (1) by failing

to supply enough, or adequately trained, servicing

personnel; (2) by failing to supply enough, or adequate,

supply parts; (3) by failing to pay many 10% commissions

when due; (4) by marketing what were essentially "Reality"

products under different names, through other dealers; and

(5) by charging Northeast higher prices than it charged

other dealers. Northeast later amended its complaint to add

a "deceit" claim that Microdata had failed to disclose

material information during contract negotiations, namely

that Microdata was selling Reality products, and would

continue to sell them, to a company called ADP, which

(according to Northeast) was both a "Reality" end user and a

competing dealer. In Northeast's view these actions and

omissions broke both explicit and implicit terms of the

contract, amounted to "fraud," and violated various

statutes, which, with the exception of Massachusetts'

"unfair trade practices" statute, are not relevant here.

See Mass. Gen. L. ch. 93A.

The parties tried the contract and fraud issues to

a jury, with the magistrate reserving the claim of violation

of Chapter 93A. The jury found that Microdata had

wrongfully terminated the distributorship; that it had

broken explicit terms in the contract by failing to pay

commissions on "end user" sales to ADP; and that it had

broken an implicit covenant of "good faith and fair dealing"

(either by failing to pay commissions on other sales, by

-4-
4

failing to supply proper parts or service, or both). It

awarded Northeast approximately $1.7 million damages. The

jury also found that Microdata had fraudulently induced

Northeast to enter the contract by failing to tell Northeast

about its ADP sales; but the jury refused to award any

damages on that claim.

The magistrate then turned to the reserved Chapter

93A claim. He noted that Northeast and Microdata had

agreed, while the case was pending, to try the contract and

"fraud" claims under California law. He reasoned that the

93A claims so closely resembled the contract and fraud

claims that the parties must have agreed "implicitly" to try

those claims under California law as well. He concluded

that, since California has no 93A-type of law, he must

dismiss Northeast's 93A claims. Northeast now appeals that

dismissal. See 28 U.S.C. 1291, 636(c)(3) (appeal from

order of a magistrate judge).

For purposes of this appeal, we have assumed

(without deciding) that Northeast is correct when it says

that it neither explicitly nor implicitly agreed, during the

course of this litigation, that California law would govern

its 93A claims. Nonetheless, Northeast did agree, in the

contract itself, that

-5-
5

This Agreement and the rights and
obligations of the parties hereto shall
be governed by and construed in
accordance with the laws of California.

In our view, Northeast's Chapter 93A claims (with one

exception) fall within this contractual choice-of-law

provision.

Northeast describes its Chapter 93A claims and,

most importantly, the alleged facts that underlie them in an

82 page document, filed with the magistrate, called

"Plaintiff's Request for Findings of Fact and Rulings of Law

on Chapter 93A Damages." Our review of the facts alleged in

that document makes clear that (as we said, with one

exception) Northeast's 93A claims amount to embroidered

"breach of contract" claims. See Caton v. Leach., 896 F.2d

939, 943 (5th Cir. 1990) (breach of implied covenant claims

are breach of contract claims); Restatement (Second) of

Contracts 176 comment e (1981). In four instances

Northeast simply says that Microdata "knowingly" or

"willfully" broke the contract by (1) failing "to provide"

proper "field service and support;" (2) failing to deliver

goods when and as promised; (3) selling goods outside the

"sole distributorship" without paying commissions; and (4)

wrongfully terminating the contract. In three other

instances Northeast says that Microdata threatened to take

-6-
6

actions that the contract forbids, with a bad motive, namely

to force Northeast to give up certain contract rights, such

as its exclusive Reality distributorship. Those badly

motivated threats (as far as the document reveals) threaten

actions that Microdata might legally have taken had there

been no contract, for they consist of claims that Microdata

threatened (1) to deny Northeast the right to sell certain

"Reality" products (such as a product called "Sequel");

(2) to sell a competing product (called "CMC") in

Northeast's exclusive territory; and (3) (in unspecified

ways) to stop Northeast from meeting its contract-imposed

buying quota.

Of course, the allegations that Microdata acted

"willfully" or "knowingly" or with a bad motive add

something to the pure breach of contract claims. Indeed,

Northeast hopes they provide the element of "rascality"

needed to bring a claim of breach of contract within the

statute. Compare Pepsi-Cola Metropolitan Bottling Co., Inc.

v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) (simple

breach of contract does not violate Chapter 93A) with Wang

Laboratories, Inc. v. Business Incentives Inc., 501 N.E.2d

1163 (Mass. 1986) (bad faith contract termination states a

Chapter 93A claim) and Levings v. Forbes & Wallace, Inc.,

-7-
7

396 N.E.2d 149 (Mass. 1979) (93A violations must involve

"rascality"). But, the relevant question here is whether

those additional "state of mind" or "bad motive" allegations

(together with other, less significant bits of embroidery)

take these claims outside the scope of contractual language

that says California law will govern "the rights and

obligations of the parties" in respect to the "Agreement."

We find that they do not.

The contract violations are essential elements of

the 93A claims. The "state of mind" and "bad motive"

allegations add little. Given the language of the

contract's choice-of-law provision (applying California law

to "rights and obligations" arising out of, or imposed by,

the "Agreement"), would it not seem surprising to find that

Massachusetts law, not California law, governed these

claims? In the absence of any contrary evidence, we believe

that, when parties agree that "contract related" claims will

be tried under, say, the law of California, they do not mean

that a claim of "serious" or "rascal-like" breach of

contract will be tried under the law of Massachusetts.

Moreover, the Massachusetts Supreme Judicial Court

has recognized that, under some circumstances, a Chapter 93A

claim "is essentially duplicative of a traditional contract

-8-
8

claim." See Canal Electric Co. v. Westinghouse Electric

Corp., 548 N.E.2d 182, 187 (Mass. 1990). That court has

permitted plaintiffs to obtain separate Chapter 93A

attorneys' fees in such circumstances, but it has denied

plaintiffs "double recovery" on both a breach of contract

claim and a 93A claim arising from the same breach. See

Linthicum v. Archambault, 389 N.E.2d 482 (Mass. 1979).

These Massachusetts decisions support our natural reading of

the scope of the contract's choice-of-law provision, for

they acknowledge that, depending on the facts, a Chapter 93A

claim may essentially reduce to a contract claim. One

federal district court has reached the same conclusion we

reach with respect to a similar contract clause. See Scheck

v. Burger King Corp., 756 F.Supp. 543, 545-46 (S.D. Fla.

1991) (clause which says franchise agreement "shall be

governed and construed under and in accordance with the laws

of the State of Florida" applies to bar Massachusetts 93A

claims which incorporate contract claims and would not exist

without the agreement).

We have found one district court case in Illinois

that reaches a different result. Fleet Mgt. Servs., Inc. v.

Archer-Daniels-Midland Co., Inc., 627 F.Supp. 550 (C.D. Ill.

1986). That district court reasoned that any violation of

-9-
9

Chapter 93A is a "tort" and therefore no alleged Chapter 93A

violation could fall within the scope of a contractual

choice-of-law provision that talks about "contracts." Id.

at 561-62. This reasoning, however, seems to exalt pleading

form over fact-related substance. Such reasoning would

undermine the parties' choice of law agreement by permitting

one of them, through artful pleading, to bring what is

little more than a breach of contract claim, under law that

both parties have agreed would not apply.

The Illinois case relied upon a Massachusetts

district court case, Computer Systems Engineering, Inc. v.

Qantel Corp., 571 F.Supp. 1365 (D.Mass. 1983), a case very

different from the present one. Qantel concerned a 93A

claim that was not, in essence, a breach of contract claim,

for the plaintiff there did not claim that the defendant

broke a contract, but rather that the defendant fraudulently

induced the plaintiff to form the contract in the first

place. See id. at 1367 (Chapter 93A claim partially based

on fraudulent inducement); see also id. at 1370 (because

tort-like claims predominate over contract-like claims in

compound 93A claim, 93A claim is outside parties'

agreement); cf. Popkin v. National Benefit Life Insurance

Co., 711 F.Supp. 1194, 1201-02 (S.D.N.Y. 1989) (Chapter 93A

-10-
10

tort claim alleging fraudulent misrepresentations to third

party with whom plaintiff had a different contract falls

outside choice-of-law clause in agency agreement between

plaintiff and defendant). Insofar as Qantel contains dicta,

Qantel, 571 F.Supp. at 1371, that might be read to mean that

every Chapter 93A claim must be viewed as a tort claim, no

matter how clearly it resembles a claim of breach of

contract, those dicta do not express our view of

Massachusetts law.

We conclude that the parties, in their choice-of-

law provision, meant that California law would govern both

ordinary and "rascal-like" breach of contract claims. We

believe that the "rascal-like" claims before us fit within

that provision. In the absence of a conflict with public

policy, Massachusetts honors choice-of-law provisions in

contracts, Morris v. Watsco, Inc., 433 N.E.2d 886, 888

(Mass. 1982), and, in this diversity case, so must we.

Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st

Cir. 1991). There is no conflict with Massachusetts public

policy here. The "dispute is essentially a private one,"

which, unlike, say, an antitrust dispute, has no third-party

effects. Cf. Canal Electric, 548 N.E.2d at 187-88

-11-
11

(corporations may waive protection of 93A by contractual

limitation of liability clause).

We turn now to the one further 93A claim that we

called an "exception." That special claim rests upon

allegations of fraud, not breach of contract. Northeast

says that Microdata, when negotiating the contract, failed

to disclose that it was currently selling Reality systems to

ADP, a firm that does business in Northeast's

distributorship area, and that it intended to continue

selling to ADP even after the contract was in effect.

Northeast says that this course of conduct amounts to a

"fraud" that falls within the scope of Chapter 93A.

Because this claim concerns the validity of the formation of

the contract, it cannot be categorized as one involving the

rights or obligations arising under the contract. Hence,

the claim falls outside the contract's choice-of-law

provision. See Qantel, 571 F.Supp. at 1372. Nonetheless,

Microdata, in its brief, refers us to the docket sheet,

which notes that Northeast agreed, in a settlement, to

stipulate that "none of" Microdata's "actions w[ith]

r[eference] t[o] ADP can form the basis of liability." A

district court memorandum confirms that, as part of the

consent judgment, Northeast "agreed that if the Court of

-12-
12

Appeals should reverse the judgment dismissing plaintiff's

Chapter 93A claim (Count X of the Second Amended Complaint),

plaintiff will not press as part of that claim any of the

defendant's actions with respect to ADP." The appeal, with

respect to this remaining ADP claim, therefore is moot. See

Pontarelli v. Stone, 978 F.2d 773, 775 (1st Cir. 1992)

(settlement of merits of underlying claims moots appeal).

Finally, we note that Northeast, in its 82 page

document, at one point alleges in a single sentence that

Microdata violated Chapter 93A by "filing and prosecuting

frivolous and meritless counterclaims and affirmative

defenses, without any attempt to introduce any evidence to

support same at the trial of this action." Because

Northeast does not separately press this claim on appeal, we

suspect that it has been abandoned. But, if it has not, we

simply point out that a claim of "abuse of process" with

nothing more does not state a violation of Chapter 93A. See

Quaker State Oil Refining v. Garrity Oil Co., 884 F.2d 1510,

1514 (1st Cir. 1989) and cases cited therein (filing legal

claim which proves baseless not in itself an unfair trade

practice, except where claim brought with ulterior motive).

For these reasons, the magistrate's order

dismissing the Chapter 93A claims is

-13-
13

Affirmed.

-14-
14